STATE of Missouri, Respondent,

v.

Robert E. NORWOOD, Appellant.

No. WD 56002.

Missouri Court of Appeals, Western District.

Dec. 28, 1999.

Nancy A. McKerrow, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

Before Presiding Judge HAROLD L. LOWENSTEIN, Senior Judge FOREST W. HANNA,[1] and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Mr. Norwood was convicted of Assault in the First Degree, a Class A felony, upon a jury verdict finding that he caused serious physical injury to Mr. Robert Stepp after Defendant knocked Mr. Stepp to the ground and stomped on his head. Defendant appeals, arguing that the evidence was only sufficient to show that he caused physical injury to Mr. Stepp, not that he caused serious physical injury to him. Because we find that the evidence was sufficient to allow the jury to find that Defendant knowingly injured the victim, causing him to suffer a closed head injury causing unconsciousness, a severe laceration, serious injury to the ear, and protracted memory loss, we find that it was sufficient to allow the jury to find that Defendant knowingly caused serious physical injury to the victim, and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the verdict, the evidence adduced below was follows: On the afternoon of June 15, 1997, Defendant, Robert E. Norwood, and the victim, Mr. Robert Stepp, sat on a bench located at a bus stop at the northwest corner of 47th Street and Troost Avenue in Kansas City, Missouri. Following a brief conversation, Mr. Stepp stood up and began to walk away. Defendant approached Mr. Stepp from behind and struck him on the back of the head. The blow caused Mr. Stepp to fall to the ground on his stomach with the left side of his face on the sidewalk. At that point, Defendant jumped and stomped down on the victim's head twice with both of his feet.

Mr. Alfred Smokorowski witnessed Defendant's attack on the victim. He later testified that, after the attack, Mr. Stepp remained motionless on the ground, with his eyes closed, for 15 to 20 minutes. He was still lying motionless on the ground when Officer Jim Payton of the Kansas City Police Department arrived at the scene. In fact, he lay so still that Officer Payton initially believed that Mr. Stepp was dead. After a period of time, Mr. Stepp did begin to move and was taken via ambulance to St. Luke's Hospital emergency room. Defendant, who remained at the scene, looked at the victim and said he should have died. Defendant was arrested and taken into custody.

Dr. Michael Shafie is supervising physician of St. Luke's emergency room. He spoke with the paramedics who were transporting Mr. Stepp to St. Luke's and, in light of the description of Mr. Stepp's injuries, determined that the hospital's entire trauma team needed to be ready to immediately treat him upon arrival. When Mr. Stepp arrived, the doctors found he had suffered multiple contusions and abrasions to his head, as well as a long, deep laceration to the left side of his scalp. The tearing and shearing force was sufficient not only to cut the skin, but also to move the skin enough that air became trapped under a flap of the skin. Mr. Stepp also had a severe laceration to his right ear that tore through the cartilage of the ear.

Due to the severity of Mr. Stepp's injuries, Dr. Shafie requested that he remain in the hospital overnight for observation. During his stay, Dr. Shafie noted that Mr. Stepp had difficulty developing new memories. The next day, Dr. Shafie released Mr. Stepp, but recommended that he rest at home for three days before returning to work.

Once he returned home, Mr. Stepp continued to experience difficulty with his memory. His sister testified that even after returning home he was unable to

1. Judge Hanna took senior status following submission of this case.

remember the attack on him, and that occasionally he would fail to even recognize her. He also experienced frequent mood changes after the attack. In addition, while, prior to the injury, he was recognized for his exceptional memory for television shows and this made him enjoy watching certain shows, after the injury he could no longer recall details about the shows and did not enjoy them any more. Finally, on at least one occasion after his hospital stay, Mr. Stepp had to return to the hospital to drain the hematoma that had formed in his right ear. As a result of the incident and the difficulty he had recovering from it, Mr. Stepp did not return to work for some 4 to 6 weeks.

Following the presentation of this evidence, the case was submitted to the jury. In Instruction No. 5 the jury was asked to determine whether Defendant's conduct constituted assault in the first degree with serious physical injury. If not, then it was to determine pursuant to Instruction No. 6 whether Defendant had committed assault in the first degree in that he attempted to cause death or serious physical injury. Instructions 7 and 8 submitted assault in the second and assault in the third degree, respectively. During its deliberations, the jury requested to see all the photographs in evidence. It then returned a verdict of guilty of assault in the first-degree with serious physical injury, a Class A felony. The court found Defendant to be a prior offender and sentenced him to 30 years imprisonment. Defendant now appeals, arguing that the evidence does not support a finding of serious physical injury and thus he should not have been convicted under Instruction No. 5 of the Class A felony of assault in the first degree.

## II.  STANDARD OF REVIEW

In determining whether there was sufficient evidence to support the jury's verdict, we view the evidence in the light most favorable to the State, resolving all inferences in favor of the verdict and disregarding all inferences to the contrary. *State v.*

*Grim,* 854 S.W.2d 403, 411 (Mo. banc), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). We do not reweigh the evidence. *In the Interest of N.A.G.,* 903 S.W.2d 664, 667 (Mo.App. W.D.1995). Rather, we simply "determine whether there was sufficient evidence from which reasonable persons could have found the defendant guilty as charged." *Id.*

## III.  THE RECORD SUPPORTED THE FINDING OF SERIOUS PHYSICAL INJURY

■ Section 565.050.1 RSMo 1994 defines the offense of assault in the first-degree, and sets out those circumstances in which it is a Class A felony, and those circumstances in which it is a Class B felony. It states in relevant part:

1.  A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person.

2.  Assault in the first degree is a class B felony unless in the course thereof the actor inflicts serious physical injury on the victim in which case it is a class A felony.

Sec. 565.050.1 RSMo 1994. Thus, whether assault in the first degree constitutes a Class A or a Class B felony depends on whether the Defendant actually caused serious physical injury, or only attempted to cause death or serious physical injury to the victim.

■ Defendant asserts that, while his stomping on the victim may have caused the victim physical injury, and while it may have created a risk of serious physical injury, it did not cause serious physical injury as defined under the statute, as that requires proof of either: (1) a physical injury that creates a substantial risk of death; (2) a physical injury that causes serious disfigurement; (3) a physical injury causing the protracted loss of the function of any part of the body; or (4) a physical injury causing the protracted impairment of the function of any part of the

body. *State v. Lanier,* 985 S.W.2d 377, 379 (Mo.App. E.D.1999); *State v. Ross,* 939 S.W.2d 15, 18 (Mo.App. S.D.1997); *State v. Baker,* 859 S.W.2d 805, 812 (Mo.App. E.D. 1993).

Defendant argues that the injuries to the victim's head and ear, the victim's loss of memory, and the victim's temporary unconsciousness, do not meet any of these definitions of serious physical injury. By contrast, the State argues that the victim suffered "a protracted loss or impairment of the function of his brain" and serious disfigurement of his right ear. For the reasons set out below, we agree with the State that the evidence was sufficient to allow the jury to make the determination that Mr. Stepp suffered serious physical injury.

The first issue we must resolve is what constitutes a serious physical injury under the statute. "Serious physical injury" in defined as:

> [P]hysical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

Sec. 556.061(28) RSMo 1994. Since the statute does not go on to define the terms "protracted," "loss," "impairment," or "function," we give them their plain and ordinary meaning. *Lanier,* 985 S.W.2d at 379.

The common and ordinary meaning of "loss" is "[a] decrease in the amount, magnitude, or degree." Merriam Webster's Collegiate Dictionary (10 th ed.1994). "Impair" is defined as "to damage or make worse by or as if by diminishing in some material respect." *Id.* "Function" is defined as "the action for which a person or thing is specifically fitted or used or for which a thing exists; any of a group of related actions contributing to a larger action." *Id.* Thus, loss or impairment of a function of the body means a decrease or diminishing or damaging of an action or ability of the body to do that for which it is intended.

Defendant argues that the loss or impairment in this case does not come within the definition of "protracted loss or impairment" because the victim was only hospitalized for 24 hours for observation, and was released to return to work three days after the incident. We disagree. "Protracted" means "[t]o prolong in time." Webster's II New College Dictionary (1995). Protracted thus means "something short of permanent but more than of short duration." *Lanier,* 985 S.W.2d at 379. Prior cases have established that this means that so long as the impairment is more than momentary, no minimum degree of trauma must be inflicted in order to constitute protracted loss or impairment. Once that threshold is met, then whether a loss or impairment is considered protracted depends not just on the length of time the effects of the injury last but also on the nature and seriousness of a dysfunction. "The question is whether the injuries inflicted in the assault, viewed objectively, are of a degree of severity sufficient to raise a legitimate concern either that the victim could expire or that the victim could suffer more than a momentary impairment of a bodily function." *In the Interest of N.A.G.,* 903 S.W.2d at 667 (trial court's belief that the victim experienced pain and loss of function for two months after the accident was sufficient to find a protracted impairment). *See also Ross,* 939 S.W.2d at 18–19 ("Seven days without the use of a leg or foot is sufficient to constitute protracted impairment"); *State v. Briggs,* 740 S.W.2d 399, 401 (Mo. App. E.D.1987) (victim's cracked rib causing him to be away from his job for 20 business days was sufficient evidence to make a submissible case for the jury on whether the victim suffered a serious physical injury); *State v. Methfessel,* 718 S.W.2d 534, 537 (Mo.App. E.D.1986) ("The loss of consciousness and memory attendant to a brain concussion represents a protracted impairment of the function of the brain").

Applying these principles here, we note that Dr. Shafie found that Mr. Stepp's injuries were serious and potentially debilitating, and this is why he required him to remain in the hospital overnight and why he obtained a CT scan of Mr. Stepp's head. In addition, the doctor noted, the laceration to the scalp was so deep that a pocket of air had developed under the flap of skin. The doctor also testified that Mr. Stepp was disoriented and had difficulty with his short-term memory at the hospital, and that this is a sign of a brain concussion. For these reasons, the doctor detained Mr. Stepp at the hospital overnight for observation. Moreover, although the doctor released Mr. Stepp the next day, he recommended that he take at least three more days to rest before returning to work, and in fact Mr. Stepp had to return to the hospital for further treatment for his ear a few days after he was released and did not return to work for 4 to 6 weeks. Dr. Shafie also testified that continued memory loss of an accident, continued memory difficulties in other areas, and changes in personality can result from a concussion and are signs of a concussion, and that these may last for some time after an injury such as Mr. Stepp's injury.

In addition, the State introduced the eye-witness testimony of Mr. Smokorowski who observed the victim's failure to move for 15 to 20 minutes immediately following the attack. The testimony of Officer Payton corroborated this testimony in that the officer, who also noticed the victim's lack of movement, initially believed the victim was dead. Based on the testimony of Mr. Smokorowski and Officer Payton, the jury could reasonably infer that Mr. Stepp had been rendered unconscious by the attack for a period of time.

Mr. Stepp's sister also testified. She said that prior to the incident he had a good memory. She noticed a loss of memory occurred immediately after the attack, however, both at the hospital, and once Mr. Stepp returned home. In addition, Mr. Stepp's sister testified that his memo-ry of other matters had changed immediately after the accident and that the memory change continued for an extended time after he returned home. She said this and the other sequelae of the accident caused him to miss work for up to six weeks, and in fact, Mr. Stepp's sister testified he still had memory problems even at the time of trial. Mr. Stepp confirmed at trial that he still had no memory of the events leading up to the assault or his stay in the hospital.

■■■ Under *Methfessel,* 718 S.W.2d at 537, and the other cases just cited, the jury could find that these injuries constituted a protracted loss or impairment of a bodily function. Defendant argues that we cannot consider the sister's testimony, however, since she is not a physician and could not provide a causal connection between the attack and Mr. Stepp's memory problems and other injuries. However, it is well-settled that under "the sudden onset doctrine, a causal connection may be inferred if the injury 'develops coincidentally with the negligent act'" *Williams v. Jacobs,* 972 S.W.2d 334, 340 (Mo.App. W.D.1998). Where the sudden onset doctrine applies, "[i]t is not essential to have medical testimony, . . ., as a causal connection between an accident and injury can be inferred in cases where there is a visible injury, or a sudden onset of an injury, or 'an injury that as a matter of common knowledge follows the act.'" *Id.* Under this doctrine, the State may employ a lay witness to "establish the nature, cause and extent of an injury 'when the facts fall within the realm of lay understanding.'" *Id.*

■■■ The question of whether this doctrine will apply depends on the facts of each case. *Williams,* 972 S.W.2d at 340. Thus, in *Pruneau v. Smiljanich,* 585 S.W.2d 252, 255–56 (Mo.App. E.D.1979), the court found that the sudden onset doctrine applied to establish the element of causation where plaintiff testified that her headaches, back pain, visual impairment and nausea appeared three to four days after an auto accident *and there was no*

*evidence of a pre-existing or intervening cause.* Similarly, in *Tucker v. Wibbenmeyer,* 901 S.W.2d 350 (Mo.App. E.D. 1995), evidence that plaintiff sustained "cuts and some localized soreness" from the accident, "slight though they may be," is sufficient to submit to the jury under the "sudden impact rule." *Tucker,* 901 S.W.2d at 351. The Court in *Tucker* noted that "[t]he most obvious cases are where a person involved in an accident suffers a broken bone or open wound. Cuts arising during or immediately after an accident are open wounds and are covered by the sudden onset rule." *Id.* (citations omitted.) And, in some cases, even where the person seeking to apply the sudden onset rule has had a prior injury, courts have found that the sudden onset doctrine may apply. *See Berten v. Pierce,* 818 S.W.2d 685 (Mo.App. W.D.1991); *Robbins v. Jewish Hosp. of St. Louis,* 663 S.W.2d 341, 345 (Mo.App. E.D.1983) ("[A]though plaintiff was unable to recall any of the events during the two days immediately following her admission to the hospital, ample evidence existed for a jury of laymen to infer a casual relationship between the incident at the hospital and plaintiff's fractured hip. Although plaintiff had suffered a pelvic injury to the groin area six months before in an unrelated accident, she had returned to work as a nurse at a rehabilitation center full time").

In contrast, the sudden onset doctrine will not apply where there is specific medical evidence suggesting that the cause of the injury was contrary to that suggested by the lay person's testimony. *See, e.g., Knipp v. Nordyne,* 969 S.W.2d 236, 240 (Mo.App. W.D.1998) (uncontradicted medical evidence supporting the finding that an aneurysm caused the worker's death, rendered inapplicable plaintiff's lay testimony that her husband's death was caused by a recent fall that caused the brain to hemorrhage); *Brickey v. Concerned Care of Midwest, Inc.,* 988 S.W.2d 592, 597 (Mo. App. E.D.1999) (unopposed medical evidence indicated respiratory failure as the immediate cause of death. Plaintiff's lay testimony alleging a head injury was not applicable as the issue of causation was beyond the lay person's understanding).

In this case, there was no preexisting injury or intervening cause, and there was no medical testimony that contradicted the testimony of Ms. McDonald. Rather, the doctor testified that he had seen memory problems in Mr. Stepp immediately after the attack which he thought might be due to the closed head injury and that it was not uncommon for memory problems to continue after a head injury like that suffered by Mr. Stepp. Mr. Stepp's sister then testified to her personal observation that the memory problems which her brother experienced in the hospital continued once he returned home, that he had not recovered his memory of the incident ever, and that his personality had changed in specific ways suddenly after the attack. Mr. Stepp also testified at the trial and told the jury that he still had no memory of the attack or even of going to the bus stop, or being in the hospital.

We find that Mr. Stepp's sister was qualified to testify to her personal observations as to her brother's actions and memory before and after the attack, and that this testimony, combined with that of the doctor and of Mr. Stepp, and in light of the other evidence, was sufficient to make a submissible case on the issue whether Mr. Stepp suffered serious physical injury. We reject Defendant's argument to the contrary. Judgment affirmed.

Presiding Judge HAROLD L. LOWENSTEIN and Senior Judge FOREST W. HANNA concur.