

# In the Missouri Court of Appeals
# Eastern District

### DIVISION FOUR

SHANNON BROWN,　　　　　　　　)
Successor Personal Representative for the　)　No. ED100593
Estate of Daniel Kruse, and Personal　　)
Representative for the Estate of　　　　)　Appeal from the Circuit Court
Sharon Kruse,　　　　　　　　　)　of St. Louis County
　　　　　　　　　　　　　)
　　　Appellant,　　　　　　　)　Circuit Court No.  12SL-CC03169
　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　)
　　　　　　　　　　　　　)　Honorable Steven H. Goldman
SEVEN TRAILS INVESTORS, LLC, et al.,　)
　　　　　　　　　　　　　)
　　　Respondents.　　　　　)

### ORDER

The Opinion issued on June 24, 2014 is hereby withdrawn.  New opinion to issue.

SO ORDERED.

Date:　　12/9/2014　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　Lisa S. Van Amburg, Presiding Judge
　　　　　　　　　　　　　　　　　Division IV
　　　　　　　　　　　　　　　　　Missouri Court of Appeals Eastern District

cc:　　David Knieriem
　　　　Timothy Sansone



# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| SHANNON BROWN, | ) | |
| Successor Personal Representative for the | ) | No. ED100593 |
| Estate of Daniel Kruse, and Personal | ) | |
| Representative for the Estate of | ) | Appeal from the Circuit Court |
| Sharon Kruse, | ) | of St. Louis County |
| | ) | |
| Appellant, | ) | Circuit Court No. 12SL-CC03169 |
| | ) | |
| vs. | ) | |
| | ) | Honorable Steven H. Goldman |
| SEVEN TRAILS INVESTORS, LLC, et al., | ) | |
| | ) | December 9, 2014 |
| Respondents. | ) | |

## Introduction

Shannon Brown (Plaintiff), as successor personal representative for the estate of Daniel Kruse and personal representative for the estate of Sharon Kruse, appeals the circuit court's order granting summary judgment for Seven Trails Investors, LLC and Madison Apartment Group, LP (Defendants) on Plaintiff's claims of negligence, nuisance, res ipsa, and gross negligence. In her sole point relied on, Plaintiff claims that the circuit court's summary judgment order is erroneous because Plaintiff presented evidence demonstrating the existence of a material factual dispute. We affirm in part, reverse in part, and remand for further proceedings.

**Factual Background**

In July 2003, Sharon and Daniel Kruse[1] began residing in an apartment located in Ballwin, Missouri, which Defendants owned and managed. Over the years, the Kruses, who were both smokers with severe chronic obstructive pulmonary disease (COPD), suffered from numerous respiratory problems. In the fall of 2008, Daniel was admitted to the hospital and developed a severe wound in his presacral area.[2] The following spring of 2009, the Kruses discovered what they believed to be mold in the apartment. The Kruses moved out of the apartment in mid-July 2009. Daniel returned to the apartment once in late July 2009 to retrieve the rest of their belongings. In August 2012, believing that mold had caused their respiratory problems and that a brown recluse spider bite had caused Daniel's wound, the Kruses filed a petition against Defendants alleging negligence, nuisance, res ipsa, and gross negligence.

Defendants moved for summary judgment, relying on the expert opinions of Drs. H. James Wedner and Thomas Arnold. Dr. Wedner opined, to a reasonable degree of medical certainty, that Sharon did not suffer adverse health effects from any mold that may have been present in the apartment and that Sharon's COPD was the most likely cause of her ailments. Similarly, Dr. Wedner determined that Daniel's repeated hospitalizations for pneumonia were not caused by mold and that the most significant cause of Daniel's respiratory ailments was his smoking habit combined with other serious health conditions. Regarding the alleged spider bite, Dr. Arnold determined that Daniel's wound was not caused by a brown recluse spider bite, but a pressure sore. Accordingly, because this evidence showed that mold and a brown recluse spider

---

[1] Sharon and Daniel Kruse originally filed this action. Both Sharon and Daniel are now deceased and Plaintiff is the personal representative of their claims. We use the Kruses' first names when referring to them individually. No disrespect is intended.

[2] The presacral area is an area within the buttocks.

bite did not cause the Kruses' alleged injuries and the Kruses had failed to present any contrary evidence, Defendants asserted that they were entitled to summary judgment.

In response, the Kruses filed a motion seeking additional time for discovery and to make a response to Defendants' motion. The circuit court granted the request. The Kruses then deposed their treating physician, Dr. Jason Hand, and filed a supplemental response to Defendants' motion. In their supplemental response, the Kruses asserted that Dr. Hand's testimony refuted Dr. Wedner's opinion that the mold did not contribute to or cause their ailments and also established that Daniel's wound was consistent with a spider bite. Ultimately, and without providing its reasons, the circuit court entered an order granting summary judgment for Defendants. This appeal followed.

### Standard of Review

Summary judgment is properly granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 74.04(c)(6). If a party meets its burden of establishing a prima facie case for summary judgment, the burden shifts to the nonmoving party to demonstrate a genuine issue of the material fact. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381-82 (Mo. banc 1993). "A 'genuine' dispute is a real and substantial one, not one consisting merely of conjecture, theory, and possibilities." *Mueller v. Bauer*, 54 S.W.3d 652, 657 (Mo. App. E.D. 2001).

We review a circuit court's decision on a motion for summary judgment de novo. *Id*. at 656. In doing so, we view all the legally admissible evidence in a light most favorable to the non-moving party, giving the non-movant the benefit of all reasonable inferences from the record. *ITT Commercial Fin.*, 854 S.W.2d at 376. Where the circuit court does not set forth its reasoning in its order granting summary judgment, we presume that the trial court based its

3

decision on grounds specified in the movant's motion for summary judgment. *Central Mo. Elec. Co-op. v. Balke*, 119 S.W.3d 627, 635 (Mo. App. W.D. 2003).

## Discussion

In her sole point, Plaintiff asserts that the circuit court's summary judgment order is erroneous because Plaintiff presented evidence demonstrating the existence of a material factual dispute. Specifically, in four subpoints, Plaintiff asserts that a genuine issue of fact exists because: (1) this "battle of the experts" is not a proper forum for summary judgment; (2) Plaintiff presented expert testimony to rebut Defendants' motion; (3) this matter is subject to the "sudden onset doctrine;" and (4) the nuisance claim does not require medical testimony. As explained in the argument portion of Plaintiff's brief, these arguments center on whether Plaintiff met the burden of demonstrating a genuine issue of material fact as to whether the mold and the brown recluse spider's venom caused the Kruses' injuries.[3] For ease of resolution, we consider Plaintiff's subpoints out of turn.

As in any tort case, Plaintiff is required to establish that Defendants' conduct was an actual cause of the Kruses' injuries.[4] *Wagner v. Bondex Int'l, Inc*, 368 S.W.3d 340, 348 (Mo. App. W.D. 2012). Commonly referred to as "but for" cause or "cause in fact," this requirement

---

[3] Plaintiff's point relied on presents at least three claims of error and fails to concisely state the legal reason for reversal or explain, in the context of the facts of this case, why these legal reasons support reversal, which violates Rule 84.04(d). A deficient point relied on preserves nothing for review. *See Jeffus v. Jeffus*, 375 S.W.3d 862, 863 n.1 (Mo. App. W.D. 2012). However, because we are able to discern the basic contentions of Plaintiff's arguments, we exercise our discretion to *ex gratia* consider Plaintiff's point.

[4] Causation is an element of all of Plaintiff's claims. *See Bickerton, Inc. v. Am. States Ins. Co*., 898 S.W.2d 595, 600 (Mo. App. W.D. 1995) ("The elements of a negligence action are a legal duty . . . , breach of the duty, proximate cause and actual damages."); *Christ v. Metro. St. Louis Sewer Dist.*, 287 S.W.3d 709, 711-12 (Mo. App. E.D. 2009) ("Injury, damage, and causation are essential elements required for recovery on the basis of nuisance."); *Green v. Plaza in Clayton Condo. Ass'n*, 410 S.W.3d 272, 282 (Mo. App. E.D. 2013) ("[N]egligence under the *res ipsa loquitur* doctrine [requires] three elements: (1) the incident would not ordinarily occur in the absence of negligence; (2) the incident was caused by an instrumentality under the defendant's control; and (3) the defendant has superior knowledge about the cause of the incident."); *Edwards v. Gerstein*, 363 S.W.3d 155, 165 (Mo. App. W.D. 2012) (gross negligence requires the same showing as ordinary negligence, but requires a heightened mental state of culpability).

4

stems from the common sense dictate that "there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. banc 1993). Once actual causation is established, it is necessary to establish proximate cause, or legal cause, which requires some sort of direct connection between the defendant's conduct and the injury, in that the "harm is a reasonable and probable consequence of the defendant's conduct." *St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 114 (Mo. banc 2007).

Further, in an action regarding liability for exposure to a toxic substance, establishing causation often involves evidence of multiple factual predicates, including: "(l) an exposure to an identified harmful substance significant enough to activate disease; (2) a demonstrable relationship between the substance and biologic disease; (3) diagnosis of such disease in the plaintiff; (4) expert opinion that the disease found in plaintiff is consistent with exposure to the harmful substance; (5) defendant was responsible for the etiologic agent of the disease diagnosed in plaintiff." *Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 585 (Mo. App. S.D. 1999).[5] However, in considering whether Plaintiff has met her burden of establishing a genuine issue of material fact as to causation, we are mindful of the Supreme Court's cautionary explanation of the causation analysis. Mainly, in undertaking such an analysis, courts "should not lose sight of the ultimate issue:"

> All of this discussion concerning the semantics of causation is less important in Missouri than in most jurisdictions because under [the Missouri Approved Instructions] we do not use the terms 1) "proximate cause," 2) "but for causation," or 3) "substantial factor" when instructing the jury. We merely instruct the jury

---

[5] In the argument portion of her brief, Plaintiff suggests that the trial court applied the incorrect standard of causation, asserting that she merely had to show that the mold contributed to the Kruses' disease and suggesting that the "manifold" level of proof necessary in toxic tort cases, such as *Lewis*, is inapplicable. This allegation of legal error is not encompassed by Plaintiff's point relied on and it is not preserved for our review. *See* Rule 84.04(e). We, therefore, do not consider it.

that the *defendant's conduct must "directly cause" or "directly contribute to cause" plaintiff's injury.* (Emphasis added).

*Sundermeyer v. SSM Regional Health Servs.*, 271 S.W.3d 552, 555 (Mo. banc 2008) (citing *Callahan*, 863 S.W.2d at 863).

## 1. Sudden Onset Doctrine[6]

We first address Plaintiff's third subpoint that the "sudden onset doctrine" applies to this case, meaning that expert testimony is not necessary to establish that the mold caused the Kruses' injures. Relying on *State v. Norwood*, 8 S.W.3d 242 (Mo. App. W.D. 1999), Plaintiff asserts that the link between mold and respiratory problems is common knowledge and that the jury could infer that the mold caused the injuries because the Kruses were sick while residing in the apartment and "became better when they left."[7] Defendants respond that the sudden onset doctrine does not apply.

As noted, proof of causation in cases involving exposure to a toxic substance typically requires a certain degree of scientific expertise. *See Lewis*, 5 S.W.3d at 585. This is because "[t]he diagnosis of disease induced by environmental factors is essentially 'a scientific undertaking' requiring proof which 'the scientific community deems sufficient for that causal link.'" *Id.* (citation omitted). As Defendants note, the requirement for expert testimony in cases like the instant matter, coincides with the requisite proof of causation in medical injury cases, where the cause of sophisticated injuries is not within a layperson's common understanding and, therefore, the plaintiff must establish the causal relationship through expert medical testimony.

---

[6] Plaintiff cites no authority to support her first subpoint that summary judgment is not permitted if the evidence adduced involves a "battle of the experts." Accordingly, we deem this subpoint abandoned. *See Grant v. Sears*, 379 S.W.3d 905, 917 (Mo. App. W.D. 2012).

[7] Plaintiff limits this argument to the mold and, therefore, we do not consider whether the sudden onset rule would also apply to the spider bite.

*See Brickey v. Concerned Care of the Midwest, Inc.*, 988 S.W.2d 592, 596-97 (Mo. App. E.D. 1999).

The sudden onset doctrine, however, provides a limited exception to the necessity of medical expert testimony to establish causation "when the facts fall within the realm of lay understanding." *Williams v. Jacobs*, 972 S.W.2d 334, 340 (Mo. App. W.D. 1998) (citation and quotations omitted). Under the rule, causation may be established through the testimony of a lay witness "where the obvious symptoms of the injury follow the trauma immediately, or with only short delay, and the injury is the type that is normally sustained in the kind of trauma involved." *Tucker v. Wibbenmeyer*, 901 S.W.2d 350, 351 (Mo. App. E.D. 1995).

Application of the rule depends on the facts of each case, but most often the rule is applied in cases where a person suffers a broken bone or an open wound immediately after an accident or within a short period of time after the accident. *See id.* In some instances, the rule has even been applied where the person suffers from a pre-existing condition. *See, e.g.*, *Berten v. Pierce*, 818 S.W.2d 685, 687 (Mo. App. W.D. 1991) (applying sudden onset rule despite pre-existing condition of a related, but different nature, which did not require scientific expertise). *But see Handshy v. Hasty*, 444 S.W.2d 48, 53 (Mo. App. 1969) (declining to apply sudden onset rule where pre-existing condition was very similar to the one for which the plaintiff claimed damages and matter was highly complex). Comparatively, the rule will not apply where the onset of the symptoms, complaints, or disability are sufficiently delayed from the event that allegedly caused the injury. *See Tucker*, 901 S.W.2d at 351; *Berten*, 818 S.W.2d at 687. Additionally, the sudden onset doctrine will not apply "where there is specific medical evidence suggesting that the cause of the injury was contrary to that suggested by the lay person's [sic] testimony." *Norwood*, 8 S.W.3d at 248.

Here, the Kruses' pre-existing conditions, including severe COPD and respiratory ailments, are very similar to—if not the same as—those for which Plaintiff claims damages. Because the claimed injuries and pre-existing conditions are not readily separable based on common knowledge, this is exactly the type of highly complex case where expert medical testimony is necessary to establish causation. *See Handshy*, 444 S.W.2d at 53. Moreover, the medical opinion of Defendants' expert directly contradicts Sharon's testimony that the mold was the cause of the Kruses' injuries. Sharon testified that she did not have respiratory problems until living in the apartment, that she continued to have breathing problems as a result of her exposure to the mold, and that her condition improved after moving out of the apartment. She also testified that Daniel contracted pneumonia "seven times in a year in a half" as result of the mold and that he never contracted pneumonia before living in the apartment. Contrarily, Dr. Wedner attested that the Kruses' pre-existing respiratory ailments, including COPD and years of smoking, were the cause of their health conditions, not mold. He further indicated that had mold been the cause of the Kruses' ailments, that they would have experienced a significant and sustained improvement after moving out of the apartment, but that neither Daniel nor Sharon experienced such an improvement.

Under these circumstances, where a plaintiff's pre-existing conditions are substantially the same as the injuries alleged and expert testimony directly contradicts the lay opinion, a jury's common knowledge and experience is insufficient to aid it in reaching a reliable conclusion as to causation. As such, *Norwood*, on which Plaintiff relies, is inapposite—the present claimed injuries are clearly unlike the head injury and sudden onset of memory problems that the victim suffered in *Norwood*, and which justified application of the rule. *See Norwood*, 8 S.W.3d at 248. Sharon's testimony that the mold caused her and Daniel's injuries because her condition

8

improved when she left the apartment and because Daniel contracted pneumonia multiple times while he resided in the apartment but not before, was not sufficient proof on the matter of causation. We reject Plaintiff's argument that the sudden onset rule obviates the need for expert testimony. Subpoint denied.

## 2. *Expert Testimony of Causation*

Having concluded that expert testimony is necessary to establish causation in this case, we turn to Plaintiff's second subpoint that Plaintiff demonstrated a genuine issue of material fact as to causation sufficient to avoid summary judgment. Because Plaintiff asserted that two different toxins—mold and brown recluse spider venom—caused the Kruses' injuries, Plaintiff's burden required her to demonstrate a causal connection between each of those toxins and the alleged harm each of them suffered. Accordingly, we consider the mold and spider bite separately.

### *Mold*

Plaintiff asserts that Dr. Jason Hand's testimony is sufficient to demonstrate a material question of fact because Dr. Hand testified that the mold contributed to the Kruses' medical conditions and hospitalizations. Defendants respond that Plaintiff presented "no evidence" of causation, that Dr. Hand's opinion is based on assumptions, and that Plaintiff, thus, failed to establish a genuine issue of material fact.

To establish causation, the Kruses presented the deposition testimony of Mr. Jonah Behrmann and Dr. Hand. Mr. Behrmann testified that he is an industrial hygienist employed by a company that tests structures for environmental hazards, including mold. Mr. Behrmann indicated that he investigated the Kruses' apartment for mold in June 2009. Mr. Behrmann said that he observed possible mold activity on the walls of the laundry room and ceiling in the

9

hallway.  After making these observations, Mr. Behrmann took four samples to test for mold: a "tape lift" from the suspect wall in the laundry room and an air sample from the laundry room, living room, and balcony outside the apartment.[8]  The results of the tape lift indicated the presence of high levels of stachybotrys, which is a type of mold, and the air samples also reflected elevated levels of stachybotrys.  Although these tests did not identify the specific species of stachybotrys, only the genus level, Mr. Behrmann testified that stachybotrys is "capable" of producing harmful "mycotoxins" and "may play a role in the development of sick building syndrome."

Dr. Hand was Sharon's treating physician since 2007 and testified that Sharon suffered from morbid obesity, obesity hypoventilation syndrome,[9] and severe COPD from being a former smoker.  Dr. Hand testified that throughout 2008 and 2009 Sharon experienced shortness of breath and prolonged hypoxia, or low oxygen, and had to be provided with oxygen tanks.  According to Dr. Hand, Sharon's oxygenation "miraculously" and dramatically improved—to the extent that she no longer needed the oxygen tanks—*after* she moved out of the apartment in July 2009.  Given this "objective evidence" and assuming the existence of high levels of mold, Dr. Hand testified to a reasonable degree of medical certainty that the mold contributed to the shortness of breath and exacerbations of COPD that Sharon experienced before moving out of the apartment. The following testimony was elicited:

> [Plaintiff's counsel:] Now, let me ask you this. I want you to assume that there were high levels of mold in her apartment . . . . Within a reasonable degree

---

[8] A tape lift is a technique used to directly examine an area of possible mold growth, by pressing a piece of tape onto the area and submitting it to laboratory analysis.  An air sample is taken with a device that uses a flowmeter to force 15 liters of air per minute through a spore trap for approximately 10 minutes.  Mr. Behrmann indicated that he conducted these tests consistent with industry standards and that he sent the samples to a laboratory to obtain the tests' results.

[9] Dr. Hand explained that this syndrome affects morbidly obese people and makes it difficult to breathe because of the excess tissue pushing against the diaphragm.

of medical certainty, was this mold contributing to cause the problems that she was having with her breathing and COPD?

> [Dr. Hand:] It's – it's much more likely with her because we saw objective evidence of dramatic improvements in her oxygenation after she moved out.

> [Plaintiff's counsel:] And therefore, within a reasonable degree of medical certainty, is it – would you believe that that shortness of breath problem she was experiencing would have been due to these high levels of mold?

> [Dr. Hand:] Much more likely. Probably 70 or 80 percent certainty. . . . Reasonable certainty.

Dr. Hand further testified "to a reasonable degree of certainty" that the mold contributed to Sharon's continued and ongoing respiratory problems because her exposure to high amounts of mold would make her sensitive to future re-exposure.

Dr. Hand was also Daniel's treating physician beginning in 2009. Dr. Hand indicated that Daniel had been a smoker for many years and suffered from heart disease, vascular disease, and advanced COPD. Dr. Hand explained that exposure to high concentrations of mold will cause a person who is sensitive to mold to have exacerbation of their disease and that Daniel was "definitely more susceptible to changes in environmental exposures." In his testimony, Dr. Hand recounted Daniel's multiple admissions for pneumonia over the summer of 2009 and noted that once the Kruses' moved out of the apartment, Daniel had one admission for an "unrelated" cardiac event, but was admitted again for respiratory failure in January 2010. Based on the assumption that high levels of mold existed in the Kruses' apartment, Dr. Hand testified that the mold contributed to Daniel's multiple hospitalizations for pneumonia in the summer of 2009 by making the COPD worse and putting a strain on his heart. Dr. Hand explained:

> [Daniel] had multiple admissions for respiratory problems over the summer . . . and then bam, they move out, he's reexposed [in late July 2009], he has one more admission. They move out and then the next admission is several months later . . . [for a] completely unrelated issue . . .

11

So what's compelling is when he was exposed to the environment he had multiple admissions for respiratory issues. When he was removed from the environment he had a relatively stable few months . . . .

\*     \*     \*

Given that [Daniel's] hospitalization stopped for lung disease for a three-month span for – well, longer than that. So – so his last hospitalization for a pulmonary issue was in August [2009], his next hospitalization for a pulmonary issue was in January. So given that all of that stopped when he moved out of the apartment, I – there is some degree of medical certainty, a reasonable amount, that mold contributed to his COPD, to his exacerbations.[10]

Contrary to Defendants' assertions, the testimony of Mr. Behrmann and Dr. Hand, and the reasonable inferences drawn therefrom, establishes the requisite evidence of causation necessary to avoid summary judgment. Mr. Behrmann's testimony sufficiently demonstrates that the Kruses were exposed to high levels of mold, which was capable of producing mycotoxins. Dr. Hand opined to a reasonable degree of medical certainty that the Kruses' exposure to this high level of mold contributed to and worsened their respiratory problems. Based on his observations in the course of the Kruses' treatment and review of their medical records, Dr. Hand concluded that these effects were consistent with the Kruses' exposure to harmful mold given that both Daniel's and Sharon's medical conditions improved after vacating the apartment.

This evidence plainly refutes Defendants' assertion that Plaintiff presented "no evidence" of "any particular airborne agent capable of [producing] disease" in the Kruses and "no evidence" of "sensitivity to any particular airborne agent." Certainly, Plaintiff did not adduce any direct evidence as to the identity of the harmful mold or that the Kruses were sensitive to such a mold, *i.e.*, evidence of the exact species of stachybotrys present or that either Daniel or

---

[10] With respect to the January 2010 admission, Dr. Hand testified that the mold did not cause this admission but that he was "100 percent" certain that the summer admissions left Daniel in a weaker state and contributed to the January admission.

12

Sharon had tested positive for an allergy to stachybotrys after an allergy test. However, such direct evidence is not required to establish causation. The "identity of the toxic substances to which the harm is attributed may be shown by circumstantial evidence," *Lewis*, 5 S.W.3d at 585, as may the connection between the Kruses' exposure to that substance and the harm suffered, *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 339 (Mo. App. E.D. 2000). Here, when the evidence is viewed in a light most favorable to Plaintiff, it is clear that she provided sufficient evidence, if just barely, from which to reasonably deduce that the mold in the Kruses' apartment exacerbated their respiratory ailments.

Defendants also contend, citing *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382 (1994), that Plaintiff's causation evidence is insufficient because Dr. Hand's causation testimony is based on three assumptions: (1) that high levels of mold existed in the Kruses' apartment; (2) that the Kruses' are sensitive to an unidentified airborne agent; and (3) that that agent induced allergic reactions in Daniel and Sharon. It is true that to have probative value, an expert opinion must not consist of conjecture or speculation, but be founded upon facts and data. *Gaddy v. Skelly Oil Co.*, 259 S.W.2d 844, 849 (Mo. 1953). As such, "[i]f an expert witness is called, the facts in evidence, coupled with those available to the witness from the witness's own investigation, must be sufficient to take the expert testimony out of the realm of guesswork." *Mueller*, 54 S.W.3d at 658. If an expert's opinion is premised on such guesswork, or is mere conjecture or imagination, then it is insufficient to demonstrate a genuine issue of material fact necessary to avoid summary judgment. *See City of Green Ridge v. Kreisel*, 25 SW 3d 559, 561 (Mo. App. W.D. 2000).

Contrary to Defendants' characterization of the record, Dr. Hand did not assume that the Kruses would be susceptible to the mold or that mold caused their symptoms. All that Plaintiff's

13

attorney asked Dr. Hand to assume was that the Kruses had been exposed to high levels of mold in their apartment. After making this assumption, Dr. Hand then concluded that the Kruses were susceptible to the mold and that the mold contributed to their ailments. Significantly, this opinion was not based on assumptions, but on Dr. Hand's medical training and experience, his review of Daniel's and Sharon's relevant medical records, and his medical observations during the treatment of both Daniel and Sharon. Further, the "assumption" that the Kruses were exposed to high levels of mold is not simply conjecture or speculation, as Defendants assert, but is supported by actual facts in the record—mainly Mr. Behrmann's testimony as to the high levels of mold found in the Kruses' apartment. This case is thus unlike *Thomas*, where the expert's opinion was not based on any factual data in the record, and instead relied on conjecture. *See Thomas*, 846 F. Supp at 1394. Consequently, Dr. Hand's causation testimony cannot reasonably be characterized as lacking factual support for summary judgment purposes. Subpoint granted as to the mold.

*Spider Bite*

Plaintiff also asserts that she demonstrated a genuine issue of fact as to the cause of Daniel's presacral wound because Dr. Hand testified that the wound was the result of either a brown recluse spider bite or necrosis. Defendants respond that the uncontroverted evidence shows that a brown recluse spider did not cause Daniel's wound.

The only evidence of causation that Plaintiff provided regarding the cause of Daniel's wound was Dr. Hand's testimony that he had reviewed Daniel's medical records, that both a spider bite and necrosis were included in the differential diagnosis, and that there was "no degree of certainty which caused it." "When a party relies on expert testimony to provide evidence of causation when there are two or more possible causes, that testimony must be given to a

14

reasonable degree of medical certainty." *Mueller*, 54 S.W.3d at 657. Clearly, Dr. Hand was unable to determine the cause of Daniel's wound with reasonable probability and simply indicated it was a matter of speculation whether a spider bite or necrosis caused the wound. Because the gist of Dr. Hand's testimony is that a spider bite *might* have caused the wound, his testimony does not constitute "substantive, probative evidence on which a jury could find ultimate facts and liability." *See id*. Plaintiff has failed to demonstrate a genuine issue of fact sufficient to avoid summary disposition. *Rice v. Hodapp*, 919 S.W.2d 240, 243 (Mo. banc 1996) (a "genuine" dispute is a "real and substantial one," not one consisting merely of conjecture, theory, and possibilities). Subpoint denied as to the spider bite.

### 3. Nuisance

In her fourth subpoint, Plaintiff asserts that the trial court erred in granting summary judgment because a nuisance claim requires no medical expert testimony. In support, Plaintiff discusses *Frank v. Envtl. Sanitation Mgmt, Inc.*, 687 S.W.2d 876 (Mo. banc 1985), and the distinction between nuisance per se and nuisance in fact, but does not explain the relevance of her assertion that medical expert testimony is not necessary to support a nuisance claim. In any case, *Frank* does not stand for the proposition that medical expert testimony is not required in nuisance cases. Moreover, because causation is an essential element of recovery for a nuisance claim, Plaintiff was required to establish causation. *See Christ v. Metro. St. Louis Sewer Dist.*, 287 S.W.3d 709, 711-12 (Mo. App. E.D. 2009). As we have already concluded, expert medical testimony is required to show causation under the facts of this case. Subpoint denied.

### Conclusion

Having reviewed the record in a light most favorable to Plaintiff, we conclude that Plaintiff demonstrated a genuine issue of material fact with respect to whether the mold caused

15

the Kruses' injuries. However, Plaintiff failed to demonstrate a genuine issue of material fact with respect to whether a brown recluse spider bite caused Daniel's wound. Accordingly, the circuit court erred by granting Defendants summary judgment as to claims related to the mold, but did not err by granting Defendants summary judgment as to claims related to the spider bite. We affirm the trial court's judgment in part, reverse in part, and remand for further proceedings consistent with this opinion.

_____
Philip M. Hess, Judge

Lisa Van Amburg, P.J. and
Patricia L. Cohen., J. concur.