**STATE of Missouri, Plaintiff-Respondent,**

v.

**Darion Lamont LEE, Defendant-Appellant.**

**No. SD 34680**

Missouri Court of Appeals,
Southern District,
Division Two.

Filed: August 23, 2017

peal is denied.

Attorney for Appellant: Carol D. Jansen of Columbia, MO.

Attorney for Respondent: Josh Hawley, Atty. Gen., Garrick F.D. Aplin, Asst. Atty. Gen., of Jefferson City, MO.

JEFFREY W. BATES, J.

Darion Lee (Defendant) was charged as a prior and persistent offender with the class A felony of first-degree domestic assault for knowingly causing serious physical injury to his girlfriend (Victim) by hitting her with his hand and a metal broom handle. *See* § 565.072.[1] Following a jury trial, Defendant was convicted of that offense and sentenced to a term of 20 years in prison.

Defendant's two points contend: (1) the trial court abused its discretion in admitting evidence of Defendant's "prior un-

---

1. All statutory references are to RSMo Cum. Supp. (2013) unless otherwise specified.

charged acts of misconduct related to his physical abuse of [Victim]"; and (2) the trial court erred by overruling Defendant's motion for judgment of acquittal at the close of all the evidence because the State failed to prove that Defendant caused "serious physical injury" to Victim. Finding no merit to either contention, we affirm.

### Factual and Procedural Background

■ "We consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences." *State v. Campbell*, 122 S.W.3d 736, 737 (Mo. App. 2004). Viewed from that perspective, the following facts were adduced at trial.

In 2014, Victim was living with her teenage children in a house, on the outskirts of the nearby town, about a quarter of a mile away from her stepfather (Stepfather) and mother. Victim's two children, her son (Son) and her daughter (Daughter), spent every other week with their father and Victim, respectively.

That summer, Victim met Defendant through an internet chat room. They exchanged phone numbers and spoke to each other for about a month. At that point, Defendant surprised Victim by asking her to pick him up in a nearby city. He said that he was going to spend the weekend with Victim. She had not known Defendant was coming or even met Defendant before that surprise visit. He extended his weekend visit indefinitely, which Victim recognized was "not normal," but she nevertheless allowed Defendant to stay.

At first, their relationship was good. It began to change after a few weeks. Defendant began to verbally abuse Victim by arguing with her and calling her names. Defendant also began to control Victim by demanding her phone, asking to whom she was speaking and refusing to let her leave Defendant's presence. Little things, like something being moved inside the house, would trigger him. He would accuse Victim of cheating on him, then apologize later and say he wouldn't do it again.

Around Halloween, Defendant again accused Victim of cheating on him and trying to leave the room to call somebody else. Defendant choked Victim and pushed her down, injuring her "tail bone really bad[.]" This was the first time Defendant physically abused Victim. Accompanied by Defendant, Victim went to the doctor. Defendant told Victim that she could not tell the doctor and staff about Defendant hurting her. Defendant said Victim "had to tell them something else." When questioned by the doctor, Victim said she had slipped on Daughter's skateboard and fallen.

After the incident in October, Victim felt like she had to walk "on eggshells" around Defendant because she did not know what was going to set him off. He would go into what she called "episodes," accusing Victim and demanding that she tell him the truth. Defendant began to keep Victim's phone and require her to converse on speaker phone so Defendant could listen. He also kept Victim's keys, money and ID. Defendant "barricaded" the house by covering the windows, pushing the couches up against the doors and putting a stick or knife in the door to keep it closed. Victim testified that it was not easy to get away, and that if Defendant caught her, it would be worse. When Victim started working in home healthcare, Defendant would accompany her and stay in the car, keeping her phone. There was an incident in the car in January that Victim described as "very bad" without further details. Victim testified that she was never away from Defendant. When Victim's children came to stay at the house, Defendant made sure that Victim covered herself up by wearing long sleeves. Victim testified that Defendant

never hit her on the face, but "loved to punch" her in her head and ear.

On March 5, 2015, Defendant's anger was triggered when he discovered a bottle of body wash had been moved. Defendant told Victim that she was going to quit making him look like a fool and that "tonight was going to be the night." Victim was unable to calm Defendant down. He started hitting Victim and punching her on her left side as she curled up on the couch, trying to protect herself. At first, Defendant hit Victim with his fists on her head, stomach, thigh and arm. Defendant then grabbed a metal broomstick and continued hitting Victim until the broomstick broke in half.[2] Defendant struck Victim on her arm, and up and down her thigh with the broomstick. This continued for a couple of hours while Defendant screamed at Victim, called her names and paced back and forth. Defendant also grabbed a curtain rod and struck Victim with that. Finally, Defendant got on top of Victim and started choking her until Victim succeeded in kicking Defendant off of her. Defendant then told Victim to "lay down and go to bed[.]" She did as she was told.

The next day, Son came to the house unexpectedly to pick up a CD. Victim took the opportunity to whisper to Son to get Stepfather. After Son left, Defendant confronted Victim about what she had told Son. At first, Victim denied telling Son anything. When she saw Defendant "hadn't put that knife back in the door" however, she "ran like hell out the door" without bothering to put on any shoes, even though there was snow on the ground. Victim ran past Son to Stepfather's house because she was afraid that Defendant might beat her again more severely.

When Victim got to Stepfather's house, she told him he had to get Defendant out of the house. She neither told Stepfather about the beating Victim had endured the previous night nor reported it to law enforcement when they responded to the scene that day. Victim stayed at Stepfather's house that night.

The following day (March 7, 2015), Stepfather observed some of the bruising on the part of Victim's arm that was visible below her short-sleeved shirt. Stepfather asked Victim if Defendant had hit her. Initially, Victim denied it because she was scared and ashamed. Ultimately, Victim told Stepfather everything. She showed Stepfather the bruises, and he took photographs. There were bruises on Victim's arm, back, and one the size of a watermelon on her left buttock and thigh. Stepfather then called the sheriff's department to report the abuse.

Victim testified that she "couldn't even put jeans on or hardly sit" as a result of the injuries Defendant had inflicted. Victim had problems sitting, leaning and standing up because of the bruises and swelling. She went to the emergency room on March 7th, which was a Saturday. It wasn't until "towards the middle of that next week" that she was able to walk or sit without problems. The bruising did not go away for weeks. Victim's hearing was also affected. She experienced ringing in her ear, testifying that "it was like I was in a barrel[.]" Victim had a CT scan conducted as a result.[3]

During Defendant's case-in-chief, he did not testify. Defense counsel called the investigating deputy, Julie Dacy, as a wit-

---

**2.** A bent and broken metal broomstick was later found in a trash pile in the yard by Stepfather.

**3.** Defense counsel objected to any further testimony regarding the results of the CT scan, and no further testimony was offered.

ness. Deputy Dacy testified that she made contact with Victim after learning of the alleged domestic assault, took her statement, and observed bruising to her body. The deputy saw bruising on the back of Victim's shoulder, down her arm, and up her thigh. Deputy Dacy described the bruising as "pretty severe," and opined, "Honestly, I don't understand how she could have sat with the bruising as bad as it was." Deputy Dacy also testified that Victim said she suffered hearing loss as a result of Defendant hitting her, and they discussed the need for Victim to seek medical treatment.

The jury found Defendant guilty of domestic assault in the first degree as charged. This appeal followed. Additional facts will be included below as we address Defendant's two points of error.

### Discussion and Decision

#### Point 1

Defendant's Point 1 challenges the admission of evidence of "prior uncharged acts of misconduct related to his physical abuse of [Victim.]" The following additional facts are relevant to this point.

In a pre-trial motion in limine, Defendant asked the court to prohibit the State from presenting evidence of "any allegations of incidents of physical abuse on the alleged victim by defendant other than the currently charged allegations," in that such evidence would be "irrelevant and highly prejudicial."

The trial court denied Defendant's request in part, allowing general testimony that "there had been past physical abuse, including that which resulted in physical injury." The court prohibited more detailed, "blow by blow" testimony of the prior abuse in order to avoid jury confusion as to the conduct at issue at trial. The court specifically noted that it would allow

testimony "regarding [Victim's] state of mind during their relationship which would include the development of fear and panic before the subject incident."

During the State's opening statement, after outlining the beginning of the relationship between Defendant and Victim, the prosecutor began to address a change in that relationship. The prosecutor stated that physical violence began to occur around Halloween of 2014, and that Victim would tell the jury briefly about that incident, including the fact that she had to go to the doctor. The prosecutor then noted, "But, she didn't report it to anybody. She became a prisoner not only of her mind but of her body as well. She stayed because she was afraid." The prosecutor mentioned that there was another physical incident in January 2015, and that Victim didn't know what to do or how to get rid of Defendant. The prosecutor also noted that "when it became physical . . . he would hit her around the ears."

During Defendant's opening statement, defense counsel emphasized that Victim initially told the investigating deputy that the abuse in question occurred on March 2nd rather than March 5th, establishing "a four day gap between the beating . . . and when it was reported." Defense counsel questioned Victim's credibility, saying the evidence would show that Victim's bruises "could not have occurred in the way that [Victim] says that . . . they occurred." Defense counsel then stated that "none of [the prior abuse] was known prior to March the 6th." Counsel further emphasized that Victim did not tell her family or her doctor about any abuse before then.

Victim was called as a witness during the State's case-in-chief. After establishing the nature of the beginning of Victim's relationship with Defendant, the State asked Victim if she noticed the relationship begin to change. Victim testified that,

around October of 2014, Defendant first physically abused her. She had to go to the doctor as a result of the injury, but Defendant went with her and told her to provide a false story regarding the source of her injuries. According to Victim, Defendant said she couldn't tell the doctor that Defendant had "pushed [her] down and [she] had hit the wall, you know, and hurt [her] tail bone really bad after he had tried to choke [her]." Victim said that she did what Defendant told her to do.

Victim testified that, after that point, she never knew what would set him off, and that Defendant would go into these "episodes" and get physical with her. She also testified that Defendant never hit her in the face because he didn't want her to bruise there, but instead would punch her in the head and ear.

On cross-examination, Victim was asked whether she told her family at any point prior to March 6th that Defendant had abused her. Victim answered that "I knew what [Defendant] was capable of. He had told me that he would kill me—hurt my kids." Counsel also questioned why Victim gave the doctor an alternative explanation of her injuries in October. Victim answered that "I was told to give an alternative explanation." When counsel suggested that Defendant wasn't in the room with her and the doctor, Victim refuted that suggestion and testified that Defendant was, in fact, in the room with her at the medical center. At the end of cross-examination, defense counsel asked Victim whether she had ever attempted to seek help when she was away from Defendant. Victim answered: "No. I wouldn't have because he had threatened me."

In the State's closing argument, the prosecutor made only one brief mention of Defendant's prior abuse of Victim. After outlining Defendant's pursuit of control over Victim, the prosecutor stated, "[I]t

finally came down to physical violence. And she told you about some of the physical violence that she endured during this time period."

 The admission of evidence is reviewed for abuse of discretion and disturbed only when the decision is clearly against the logic of the circumstances. *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009). "[W]e will reverse only if the error was so prejudicial that it denied the defendant a fair trial." *State v. Hitchcock*, 329 S.W.3d 741, 749 (Mo. App. 2011). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006).

 "Evidence of prior uncharged misconduct is inadmissible for the sole purpose of showing the propensity of the defendant to commit such acts." *State v. Gilyard*, 979 S.W.2d 138, 140 (Mo. banc 1998). Such evidence, however, "is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial ... and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993).

 "It is well settled in the law that, in cases of murder or assault, prior assaults or abuse by the defendant of the victim are admissible as being logically relevant to show motive, intent, or absence of mistake or accident." *State v. Danikas*, 11 S.W.3d 782, 789-90 (Mo. App. 1999). "Such evidence is only admissible for those purposes, however, if the defendant puts motive, intent, mistake or accident at issue in the case." *State v. Tolliver*, 101 S.W.3d 313, 315 (Mo. App. 2003). Where "the State presents direct evidence that the defen-

dant committed the act charged, the proof of the act ordinarily gives rise to an inference of the required *mens rea.*" *State v. Wallace*, 943 S.W.2d 721, 725 (Mo. App. 1997); *see also State v. Chism*, 252 S.W.3d 178, 185 (Mo. App. 2008) ("denial of the act does not make intent an issue simply because it is an element of the charge"). In *Wallace*, the western district of this Court held that "unless and until the defendant challenges the intent element, the prosecutor's need to introduce evidence of prior bad acts is minimal, while the prejudicial effect of admitting the evidence is substantial." *Wallace*, 943 S.W.2d at 725.

▆▆▆ Relying primarily on *Wallace*, Defendant argues that evidence of his prior uncharged acts of physical abuse of Victim was "neither logically nor legally relevant where motive, intent, absence of mistake or accident, common scheme or plan, and identity were not at issue at trial." Based on this premise, Defendant points to Victim's detailed testimony of prior specific abuse—in October 2014 when she went to the doctor—and further argues such evidence prejudiced him "by confusing the jury as to the conduct for which [he] was on trial and encouraged the jury to convict him on the basis of the uncharged acts of misconduct." Defendant therefore argues that the trial court abused its discretion in admitting such evidence. We disagree.

▆▆▆ It is also well settled that evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged may be admissible "to present a complete and co-herent picture of the events that transpired." *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011); *State v. Miller*, 372 S.W.3d 455, 474 (Mo. banc 2012). As such, "[e]vidence of prior bad acts may be admissible to explain a witness's delay in reporting a matter to the police." *Miller*, 372 S.W.3d at 474.[4]

In *Miller*, the victim of sexual abuse by the defendant testified that she did not tell anyone about it when it started because she was afraid. *Id.* at 473. In support, she testified that she had witnessed the defendant hit her mother and her brothers on several occasions. *Id.* Our Supreme Court noted that "because [the victim's] credibility was being called into question as a central factor in [the defendant's] defense, such evidence was relevant to show why [the victim] did not come forward with the allegations sooner than she did." *Id.* at 474. The Court held that the evidence of the defendant's prior physical abuse of the victim's mother and brothers "does tend to give a 'complete and coherent picture of the events that transpired,' more specifically why [the victim] did not speak up earlier about the abuse...." *Id.*; *see also State v. Sanders*, 481 S.W.3d 907, 913-14 (Mo. App. 2016); *State v. Sprofera*, 372 S.W.3d 17, 20 (Mo. App. 2012); *State v. Hitchcock*, 329 S.W.3d at 749-51.

We reach the same conclusion here. Defendant's prior uncharged physical abuse of Victim was admissible to show the escalation of Victim's fear of Defendant and explain why she did not immediately report the charged abuse that occurred on March 5th. Victim did not report the abuse to law enforcement on March 6th when

---

4. In *Wallace*, the only argument offered by the State at trial for placing evidence of prior abuse before the jury was "to show Wallace intended 'serious physical injury,' rather than less than serious physical injury." *Wallace*, 943 S.W.2d at 724. That is not the case here. The State correctly argues that Defendant's prior abuse explained Victim's delay in reporting the charged abuse and provided a more complete and coherent picture of the circumstances surrounding the offense. *See Miller*, 372 S.W.3d at 474. Therefore, *Wallace* does not support Defendant's argument.

they came to remove Defendant from her house. Victim did report the abuse on March 7th, but only after Stepfather observed bruising on Victim's arm. Victim testified that she did not report the abuse because she was afraid of Defendant. When she tried to get away, Defendant would catch her and it would be worse. Victim was too scared to try to defend herself. When asked on cross-examination why she didn't tell her family about being abused by Defendant in the past, Victim testified that "I knew what [Defendant] was capable of. He had told me that he would kill me—hurt my kids."

Defendant's theory of defense at trial was that Victim was not credible. That argument was based in large part upon: (1) Victim's delay in reporting the abuse; and (2) Victim's failure, prior to March 7th, to report any of the uncharged abuse to her family, doctor or law enforcement.[5] Thus, evidence of Defendant's prior uncharged abuse was admissible to explain the delay in Victim's reporting of the charged abuse and to provide a more complete and coherent picture of the circumstances surrounding the offense. The trial court's ruling, therefore, was not clearly against the logic of the circumstances and was not an abuse of its discretion. Point 1 is denied.

### Point 2

■ Defendant's second point contends the trial court erred in overruling Defendant's motion for acquittal at the close of all the evidence because the State did not prove that Defendant caused "serious physical injury" to Victim. "We ordinarily review a trial court's ruling on a motion for judgment of acquittal in a jury-tried case to determine whether the State

made a submissible case." *State v. Bumbery*, 492 S.W.3d 656, 661 (Mo. App. 2016). Under that standard of review, the issue is whether the State presented sufficient evidence from which a reasonable juror could have found Defendant guilty of the crime beyond a reasonable doubt. *State v. Bateman*, 318 S.W.3d 681, 686-87 (Mo. banc 2010). This is not an assessment of whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather a question of whether, in light of the evidence most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 687; *State v. Nash*, 339 S.W.3d 500, 508-09 (Mo. banc 2011).

■ Defendant was found guilty of domestic assault in the first degree. *See* § 565.072. In pertinent part, this statute states that "[a] person commits the crime of domestic assault in the first degree if he ... knowingly causes ... serious physical injury to a family or household member[.]" § 565.072. "Serious physical injury" is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or *protracted* loss or impairment of the function of any part of the body[.]" § 565.002(6) RSMo (2000) (emphasis added). The terms "protracted" and "impairment" are not defined by statute, and thus are interpreted according to their "plain and ordinary meaning." *State v. Norwood*, 8 S.W.3d 242, 246 (Mo. App. 1999). Protracted means "something short of permanent but more than of short duration." *State v. Lanier*, 985 S.W.2d 377, 379 (Mo. App. 1999); *Norwood*, 8 S.W.3d at 246.[6]

---

5. Relying upon Victim's initial statement to Deputy Dacy that the charged abuse occurred on March 2nd rather than March 5th, counsel argued that this "establishe[d] a four day gap between the beating allegedly occurring and when it was reported." Defense counsel asked the jury in closing argument, "[W]hy would she spend four days there?"

■ ·Defendant challenges only the element of "serious physical injury," arguing that Victim's impairment was not "protracted." According to Defendant, Victim's bruises and her injury to her ears caused her to suffer a loss or impairment for only "a short duration of less than a week[.]" Based upon this premise, Defendant contends there was insufficient evidence to allow a jury to find beyond a reasonable doubt that Defendant caused "serious physical injury" to Victim. We disagree.

■ With respect to a protracted impairment, "so long as the impairment is more than momentary, no minimum degree of trauma must be inflicted in order to constitute protracted loss or impairment. Once that threshold is met, then whether a loss or impairment is considered protracted depends not just on the length of time the effects of the injury last but also on the nature. and seriousness of a dysfunction." *Norwood*, 8 S.W.3d at 246. "The fact that a person recovers from an injury without residual damage does. not eliminate the possibility that the person suffered 'serious physical injury.' " *State v. Ross*, 939 S.W.2d 15, 18 (Mo. App. 1997). "Whether an injury constitutes protracted impairment depends on the circumstances of each case." *Id.*

Contrary to Defendant's argument, the record contains sufficient evidence from which the jury could have reasonably found beyond a reasonable doubt that Victim suffered "a protracted loss or impairment of the function of any part of the body[,]" which satisfied the element that Defendant caused serious physical injury to Victim. *See* § 565.002(6) RSMo (2000); § 565.072.

The beating inflicted on Victim by Defendant was severe and extensive. Defendant initially hit Victim with his fists, striking her head, stomach, thigh and arm. Then, Defendant grabbed a metal broomstick and continued hitting Victim until the broomstick broke in half. The assault continued for a couple of hours. After the broomstick broke, Defendant continued to strike Victim with a curtain rod. There were bruises on Victim's arm and back, as well as one the size of a watermelon on her left buttock and thigh.[7] Deputy Dacy characterized the beating as severe and opined that she didn't understand how Victim "could have sat with the bruising as bad as it was." That opinion was corroborated by Victim's own testimony that she "couldn't even put jeans on or hardly sit" as a result of the injuries inflicted by Defendant. Victim testified that she had problems sitting, leaning and standing up because of the bruises and swelling.

Victim's testimony that the worst of her injuries—inflicted on March 5th (a Thursday)—lasting well into the middle of the following week, was sufficient to show her impairment was protracted. *See, e.g., Ross*, 939 S.W.2d at 19 ("Seven days without the use of a leg or foot is sufficient to constitute protracted impairment."); *see also Norwood*, 8 S.W.3d at 246 (protracted impairment depends not just on the length

---

6. "Webster's defines 'impairment' as 'damage, injury or deterioration,' " *State v. Baker*, 859 S.W.2d 805, 812 (Mo. App. 1993). "[L]oss or impairment of a function of the body means a decrease or diminishing or damaging of an action or ability of the body to do that for which it is intended." *Norwood*, 8 S.W.3d at 246.

7. The trial court commented at sentencing: "I would be hard pressed to think that this case did not involve serious physical injury. In fact, I'm kind of surprised that that's an argument in this case. I don't know how badly you would have to beat somebody, how badly you would have to bruise them, to come to serious physical injury if this was not the case."

of time the effects of the injury last, but also on the nature and seriousness of a dysfunction). Additionally, Victim's testimony that her bruises did not heal for weeks could also have led a reasonable juror to conclude that, due to the attendant pain, Victim suffered some impairment for that length of time. A reasonable juror could have found that the loss or impairment of the ability to sit and rest comfortably for even just a few days could have easily felt "protracted," if not interminable. In addition, Victim testified that she experienced ringing in her ear and hearing loss, for which a diagnostic CT scan had been conducted. In sum, there was sufficient evidence by which a jury could have reasonably found Defendant caused serious physical injury because. Victim suffered from a protracted impairment. Point 2 is denied.

The judgment of the trial court is affirmed.

NANCY STEFFAN RAHMEYER, C.J./P.J.—CONCUR

WILLIAM W. FRANCIS, JR., J.—CONCUR