

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED110073 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Jefferson County |
| vs. | ) | |
| | ) | Honorable Victor J. Melenbrink |
| JUAN MADRIGAL, JR., | ) | |
| | ) | |
| Appellant. | ) | FILED: September 20, 2022 |

## Introduction

Juan Madrigal, Jr. ("Madrigal") appeals from the trial court's judgment following jury

convictions on first-degree domestic assault, second-degree domestic assault, and attempted

victim tampering. Madrigal raises four points on appeal. Point One challenges the sufficiency

of the State's evidence that Madrigal caused Victim serious physical injury to sustain his

conviction on the class A felony of first-degree domestic assault. Point Two contends the

omission of the definition of serious physical injury from the jury instruction for first-degree

domestic assault was prejudicial error. Points Three and Four maintain the trial court abused its

discretion in admitting prior bad act evidence that was more prejudicial than probative.

Evidence was presented at trial showing Victim's loss of consciousness along with bruising and

abrasions to various parts of Victim's body after being strangled by Madrigal. Because such

evidence was sufficient to prove Madrigal caused Victim serious physical injury, we deny Point

One. Because the trial court instructed the jury on the definition of serious physical injury in a

separate instruction pursuant to the Missouri Approved Instructions–Criminal 4th (2017) ("MAI-CR") Notes on Use, no instructional error occurred, and we deny Point Two. The record shows that evidence of Madrigal's prior bad acts was properly admitted at trial either because Madrigal opened the door to such evidence through his cross-examination of Victim or because the evidence was relevant to prove Madrigal's intent to harm Victim and presented a complete and coherent picture of their relationship and what led to the charged offenses. Accordingly, we deny Points Three and Four and affirm the trial court's judgment.

Factual and Procedural History

The following facts are presented in the light most favorable to conviction. See State v. Stewart, 560 S.W.3d 531, 533 (Mo. banc 2018) (quoting State v. Wright, 382 S.W.3d 902, 903 (Mo. banc 2012)).

The incident underlying this appeal arose during a domestic dispute between Madrigal and Victim on April 5, 2019. Victim was living at the house belonging to her mother ("Mother"). Madrigal moved in when he and Victim began dating. Victim and Madrigal's relationship was marked by arguments and fights. On the day of the incident that led to the present charges, Madrigal and Victim were arguing when Madrigal backhanded Victim, striking her in the mouth and causing her lip to bleed. Victim told Madrigal that their relationship was over and he needed to move out. Madrigal yelled at Victim to sit on the bed as he began packing his belongings, then started to strangle her with his hands around her throat. Madrigal grabbed Victim by the front of her shirt and dragged her through the house. Madrigal took Victim to the kitchen, where he strangled her until she lost consciousness. Victim's head was against the sink, and when she regained consciousness, she had trouble breathing and was hyperventilating. Victim asked Madrigal to stop but he again strangled her until she lost consciousness. When Victim again recovered consciousness, she was crying and unable to breathe. Madrigal retrieved

2

a knife and held it against Victim's back, threatening to kill her if she did not stop crying. After Madrigal took Victim into the bathroom, she was able to break free and run outside to seek help. When Victim reached a neighbor's house and called for help, Madrigal left the area.

Sheriff's Deputy Keith Crowley ("Deputy Crowley") responded to the scene. Deputy Crowley saw that Victim appeared oriented but disheveled and frightened, had a shaky voice, and had redness around the front of her throat as well as a "fat lip." Deputy Crowley took photographs of Victim's injuries, which included red marks on her cheek, a cut, a bruised lip, and bruising to her neck and throat. Deputy Crowley offered Victim medical care, which Victim declined, stating she would see her own physician. Deputy Crowley did not believe it was necessary to call for paramedics.

Victim filed for a restraining order against Madrigal so that he would not be able to return to Mother's house. Victim told Mother that Madrigal attacked her and tried to kill her. When Mother, a registered nurse, returned home that evening, she observed that Victim was distraught and shaking, had red marks on her neck, broken blood vessels in her face and jaw, and petechiae in her cheeks. Mother drove Victim to the hospital. Mother noticed Victim was swallowing a lot, which she believed was consistent with Victim having trouble with her throat.

Mary Bordner ("Nurse Bordner"), a nurse practitioner, treated Victim at the emergency room. Victim reported general soreness, pain, and bruising in multiple areas, including her chest, knees, lower back, and neck. Nurse Bordner observed that Victim was stable but a little distressed and had a swollen face with lip abrasions and bruising on her throat. Nurse Bordner was concerned Victim may have had more severe internal injuries and ordered several screening tests, including a chest x-ray and CTs of Victim's head, cervical spine, lower back, and knees.

The hospital discharged Victim later that night after the test results did not indicate hospital admission was necessary.

The State charged Madrigal with first-degree domestic assault, second-degree domestic assault, first-degree harassment, armed criminal action, and first-degree tampering. While in custody, Madrigal called Victim and tried to get her to have the charges against him dismissed. The State then charged Madrigal with an additional count of tampering with a victim.

Prior to trial, the State gave notice of its intent to introduce several pieces of prior bad act evidence. Madrigal opposed the admission of such evidence as being improper propensity evidence that was not relevant to the issues in the case. The parties argued their respective positions on the admissibility of the prior bad act evidence, including how the relevance of certain issues may depend on defense counsel's cross-examination. The trial court deferred its evidentiary ruling until after Madrigal cross-examined Victim.

The case proceeded to trial. During his cross-examination of Victim, Madrigal asked about the phone calls he placed to Victim from jail and whether Victim could have refused his calls. The trial court then revisited the State's request to introduce the prior bad act evidence. Over Madrigal's objections, the trial court allowed the State to introduce during its redirect examination of Victim, a voicemail Madrigal left on Victim's phone (the "Voicemail") and testimony about a prior strangling episode (the "Seatbelt Incident").

The Voicemail was a message left by Madrigal on Victim's phone one month before the April 5 incident. In the message, Madrigal cursed at Victim and threatened that if she did not answer his calls, he would go to the Division of Family Services ("DFS") about her children, go by her job, and generally ruin her life, saying, "If you don't want me to ruin your [] life [], answer the [] phone."

4

The Seatbelt Incident occurred the day before the April 5 incident. While Madrigal and Victim were in the car, Madrigal acted erratically, yelled at Victim, and tried to take her purse. Madrigal wrapped the seatbelt around Victim's throat and strangled her. Madrigal told Victim he would kill her if she tried to end their relationship.

The State called Kathryn Howard ("Nurse Howard") as an expert witness in forensic nursing with specialized training concerning the effects of strangulation. Nurse Howard testified that strangulation can cause death. Specifically, Nurse Howard explained that strangulation blocks blood flow to the brain and deprives the brain of oxygen. Brain cells begin to die after ten seconds of oxygen deprivation and do not regenerate. A person being strangled may lose consciousness at ten to fifteen seconds, bladder control at fifteen to twenty seconds, and bowel control at thirty seconds. Brain death due to lack of oxygen occurs, on average, after one to two minutes of sustained pressure. The amount of pressure required to cut off blood flow is about half the amount of pressure required to open a soda can.

Nurse Howard testified that strangulation often leaves no visible injuries because a person may lose consciousness and go limp with a minimal amount of pressure within a short amount of time. Nurse Howard differentiated the terms choking and strangulation, explaining that choking is when something occurs internally within the body that obstructs the airway, whereas strangulation occurs when a force external to the body blocks the airway. Nurse Howard testified at length about the medical consequences of strangulation. For instance, she explained that sixty-two percent of strangulation victims have no visible injuries on the neck because a person generally loses consciousness and goes limp in ten to fifteen seconds. She noted that repeated strangulations increase the amount of brain damage inflicted and may leave scratches and bruises. Strangulation commonly causes rupturing of the blood vessels resulting in

5

petechiae, which are pinpoint red dots that may appear on the scalp, behind the ears, on the neck, and in the eye. When petechiae exist on the face, they also exist on the brain, and are visible in postmortem pictures as dots on the brain where it is bleeding. Strangulation increases the risk of twenty-five different conditions, including delayed death, behavior changes, seizures, thyroid disorders, delayed stroke, permanent neck injuries, permanent hoarseness, difficulty swallowing, encephalopathy, and post-traumatic stress disorder ("PTSD"). Strangulation applied to the carotid artery presents a substantial risk of delayed stroke as well as a risk of an immediate, fatal blood clot. Medical professionals recommend screening for such internal injuries because one in forty-seven victims suffers a carotid dissection or a clot at the site of strangulation.

Nurse Howard reviewed Victim's medical records and opined that Victim's reported symptoms of neck bruising, abrasions, tenderness, and loss of consciousness were consistent with strangulation. Nurse Howard stated that the photographs of Victim depicted a swollen face, bruising on the neck and chin, a lip abrasion or laceration, and dots on Victim's face that could potentially be petechiae. Nurse Howard further noted that Victim's photographs were taken within twenty-four hours of the incident, and the abrasions could develop into bruises after several days. On cross-examination, Nurse Howard identified various signs and symptoms associated with strangulation that were not indicated in Victim's hospital records, including the lack of petechiae, bladder or bowel control, acute brain injury, weakness, difficulty speaking or facial drooping, marks, bruising or blood on her ears, ringing in her ears, problems swallowing, drooling, or with nausea, swollen tongue, lung obstructions, and not appearing disoriented or memory-impaired. Nurse Howard testified a person can still be strangled and lose consciousness without experiencing incontinence, and she stated the majority of her strangulation patients did not report incontinence.

6

After the close of the State's evidence, the trial court issued the jury instructions. The instruction for first-degree domestic assault, Instruction 5, included the term "serious physical injury" but did not include the definition of "serious physical injury" within the instruction. Instruction 10, which was submitted for the lesser-included offense of fourth-degree domestic assault, also contained the term "serious physical injury." A separate instruction, Instruction 21, defined "serious physical injury" as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." Madrigal did not object to those instructions.

The jury found Madrigal guilty of first-degree domestic assault, second-degree domestic assault, and attempted victim tampering. Madrigal was acquitted on the charges of first-degree tampering, armed criminal action, and first-degree harassment. Following the jury's convictions, the trial court entered judgment and sentenced Madrigal to concurrent prison terms of twenty-five years for first-degree domestic assault, seven years for second-degree domestic assault, and seven years for victim tampering. Madrigal moved for acquittal and a new trial, which the trial court denied. Madrigal now appeals.

Points on Appeal

Madrigal raises four points on appeal. Point One argues the trial court erred in denying his motion for acquittal and motion for new trial on the class A felony of first-degree domestic assault because the State failed to present sufficient evidence that Madrigal caused serious physical injury to Victim. Point Two contends the trial court plainly erred by instructing the jury on first-degree assault without including the required definition of serious physical injury within the instruction. Point Three maintains the trial court abused its discretion in admitting the Voicemail because it did not show Madrigal threatened Victim with physical harm and its admission prejudiced him in that the Voicemail related to Madrigal's prior bad conduct, which

7

suggested Madrigal's propensity to commit the charged offenses. Point Four asserts the trial court abused its discretion in admitting the Seatbelt Incident because evidence of the prior bad act was highly prejudicial and merely showed Madrigal's propensity to commit the charged offenses.

Discussion

## I.      Point One—Sufficient Evidence of Serious Physical Injury

Madrigal first challenges the trial court's denial of his motion for acquittal and motion for new trial alleging the State did not present sufficient evidence to support a finding that he caused Victim serious physical injury.

### A.      Standard of Review

"We ordinarily review a trial court's ruling on a motion for judgment of acquittal in a jury-tried case to determine whether the State made a submissible case." State v. Lee, 528 S.W.3d 59, 67 (Mo. App. S.D. 2017) (internal quotation omitted). "When considering the sufficiency of the evidence on appeal, this Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt." Stewart, 560 S.W.3d at 533 (quoting Wright, 382 S.W.3d at 903). We view the evidence and all reasonable inferences in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. Id. (quoting Wright, 382 S.W.3d at 903). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Wright, 382 S.W.3d at 903); Lee, 528 S.W.3d at 67 (quoting State v. Bateman, 318 S.W.3d 681, 686–87 (Mo. banc 2010)).

8

B.    Analysis

To uphold the jury conviction on the class A felony of first-degree domestic assault, the record must contain sufficient evidence from which the jury reasonably could have found Madrigal caused Victim serious physical injury.  See Section 565.072.1–2.[1]  Missouri law defines serious physical injury as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body[.]"  Section 556.061(44).  "The definition of 'serious physical injury' . . . can be described as consisting of three categories of injuries: (1) physical injury 'that creates a substantial risk of death[;]' (2) physical injury 'that causes serious disfigurement[;]' or (3) physical injury that causes 'protracted loss or impairment of the function of any part of the body.'"  State v. Carpenter, 592 S.W.3d 801, 805 (Mo. App. S.D. 2019) (quoting State v. Hughes, 469 S.W.3d 894, 900 (Mo. App. E.D. 2015)).

The State charged Madrigal with the class A felony of first-degree domestic assault for inflicting serious physical injury on Victim by repeatedly strangling her.  Madrigal maintains none of the three categories for serious physical injury in Section 556.061(44) are met by the evidence at trial.  The parties primarily focus on the first category—whether twice strangling Victim to a state of unconsciousness created a substantial risk of death.  The parties also dispute whether the evidence of injury meets the other categories of serious disfigurement or protracted impairment.  See Section 556.061(44).

### 1.    Physical Injury Creating a Substantial Risk of Death

"Substantial risk of death 'suggests circumstances which give rise to apprehension of life[-]threatening consequences.'"  State v. Hall, 561 S.W.3d 449, 453 (Mo. App. S.D. 2018)

---

[1] All Section references are to RSMo (2016).

(quoting State v. Kruger, 926 S.W.2d 486, 488 (Mo. App. E.D. 1996)). "The question is whether the injuries inflicted in the assault, viewed objectively, raise a legitimate concern either that the victim could die or suffer more than a momentary loss of bodily function." Id. at 556 (internal citations omitted). Importantly, a victim's "survival of the assault does not render her condition any less serious nor does it negate the proposition that she sustained serious injuries that could have life[-]threatening consequences." Kruger, 926 S.W.2d at 488 (internal citation omitted); State v. Johnson, 770 S.W.2d 263, 266 (Mo. App. W.D. 1989) (internal citation omitted) ("The mere fact that a victim of an assault recovers without residual damage does not render proof of serious physical injury insufficient.").

Considerable precedential authority establishes that a defendant strangling or striking the victim to a loss of consciousness supports a jury's finding that serious physical injury occurred. See, e.g., Hall, 561 S.W.3d at 453; State v. Crudup, 415 S.W.3d 170, 174 (Mo. App. E.D. 2013). In a recent opinion from the Southern District, the defendant argued the record lacked sufficient evidence of serious physical injury where the defendant struck the victim on the back of the head, causing her to lose consciousness, then held her head underwater for several seconds. Hall, 561 S.W.3d at 453. Similar to Madrigal's argument that repeatedly strangling Victim until she lost consciousness did not establish a legitimate risk of death, the defendant in Hall argued that "[t]here is not a legitimate concern that when someone is rendered unconscious by a punch that they will die." Id. The Southern District rejected the defendant's reasoning and stated that *"[l]oss of consciousness has also repeatedly been found to contribute to a finding of serious physical injury."* Id. (citing Crudup, 415 S.W.3d at 174; State v. Methfessel, 718 S.W.2d 534, 537 (Mo. App. E.D. 1986)) (emphasis added). The Southern District found the victim's testimony that she had difficulty breathing and was coughing when she regained consciousness

10

supported finding she suffered injuries that created a substantial risk of death.  Id. at 454.  The Southern District concluded that in viewing the overall course of the defendant's conduct, "[a] reasonable juror could certainly conclude that *[the] [d]efendant's actions of beating [the] [v]ictim until she was unconscious and subsequently holding her head underwater raised 'a legitimate concern' that Victim could die."*  Id. (internal citation omitted) (emphasis added).

In Crudup, this Court found sufficient evidence of serious physical injury to sustain the defendant's conviction on felonious restraint where the defendant held the victim down on the bed, choked[2] her unconscious, and caused her to fall against the dresser and injure her head.  Crudup, 415 S.W.3d at 174.  Photographs of the victim's neck depicted bruises and nail marks, and the victim's head wound had to be closed with a staple.  Id.  In holding that the defendant's restraint of the victim exposed her to a substantial risk of death sufficient to constitute serious physical injury, this Court stated that "[b]y choking [the] [v]ictim unconscious to subdue her, we find that [the defendant] both restrained [the] [v]ictim so as to interfere substantially with her liberty and exposed her to a substantial risk of serious physical injury, *in that choking someone into unconsciousness inherently creates a substantial risk of death*."  Id. (internal citations omitted) (emphasis added); see also State v. Carlock, 242 S.W.3d 461, 465 (Mo. App. S.D. 2007) (finding that where the defendant having choked the victim with a telephone cord put pressure on her neck such that she was "seeing stars" and nearly lost consciousness several times, the victim's asphyxiation could have resulted in her death or serious physical injury so as to make the cord a dangerous instrument supporting conviction on second-degree assault).

Madrigal contends that Victim's injuries were insufficient to meet the statutory requirements of serious physical injury.  However, many of the authorities upon which Madrigal

---

[2] For purposes of this discussion, we ignore the lack of distinction in the case law between choking and strangling, recognizing the terms are used interchangeably to describe a defendant blocking the victim's airway.

11

relies address only the categories of protracted impairment or serious disfigurement—and not a substantial risk of death. See, e.g., State v. Baker, 859 S.W.2d 805, 813 (Mo. App. E.D. 1993) (finding testimony that an injury caused "stiffness" was sufficient to support a finding of serious physical injury because "the jury could fairly infer from [the victim's] testimony that protracted stiffness in the shoulder constitutes an impairment of the shoulder's function."). In determining what evidence is sufficient to demonstrate a substantial risk of death, Missouri courts have focused on the legislature's use of the term "risk," "which connotes something less than a probability or likelihood." Johnson, 770 S.W.2d at 265–66 (internal citation omitted). "At a minimum, substantial risk of death suggests a condition of endangerment with cause for apprehension of life-threatening consequences." Id. at 265.

Here, ample evidence from lay and expert witness testimony and medical records support the jury's conclusion that Victim suffered serious physical injury from Madrigal's assault under the statutory category of physical injury creating a substantial risk of death. See Section 556.061(44); Hall, 561 S.W.3d at 453 (internal citation omitted). Victim testified that Madrigal repeatedly strangled her—first on the bed and then twice to the point that she lost consciousness. As in Hall, we find significant that Victim testified that when she regained consciousness, she had trouble breathing and was hyperventilating. See Hall, 561 S.W.3d at 454. When Deputy Crowley responded to the incident, he took photographs of Victim and observed redness and bruising to Victim's neck and throat as well as a bruised lip. Mother, a registered nurse, testified that she observed Victim had red marks on her neck, broken blood vessels in her face and jaw, and petechiae in her cheeks. At the hospital, Victim reported soreness, pain, and bruising in multiple areas. Mother noticed that Victim was swallowing a lot, which she believed indicated Victim was having trouble with her throat. Nurse Bordner noted Victim had a swollen face and

12

ordered multiple screening tests, including x-rays and CT scans, because she was concerned Victim was at risk for having more severe internal injuries.

Nurse Howard, an expert witness with specialized training on the effects of strangulation, reviewed Victim's medical records and photographs and opined that Victim's reported symptoms of neck bruising, abrasions, tenderness, and loss of consciousness were consistent with injuries from strangulation. Nurse Howard explained that strangulation requires only slight pressure for a short amount of time to block the airways and cause a person to lose consciousness and go limp. Victim suffered visible injuries shown by the same-day photographs presented to the jury alongside the testimonies of Victim, Deputy Crowley, Mother, and Nurse Bordner.

Importantly, Nurse Howard testified as to the severity of the substantial risk of death presented to Victim as a result of being twice strangled to a state of unconsciousness. See Hall, 561 S.W.3d at 453–54 (noting that a victim being strangled unconscious contributes to a finding of severe physical injury); Crudup, 415 S.W.3d at 174 (same). Nurse Howard testified that strangulation blocks blood flow to the brain, deprives the brain of oxygen, and can result in brain cells dying after only a few seconds and brain death occurring after only one to two minutes of sustained pressure. In addition to the risk of death by strangulation, Nurse Howard noted the association of strangulation to an increased risk of twenty-five different conditions and testified as to the relationship between victims of strangulation and the subsequent occurrence of blood clots, which can be fatal. The record reflects that Nurse Bordner ordered x-rays and CT scans, underscoring the severe risk of internal trauma Victim faced from the strangulation. Victim testified that Madrigal strangled her multiple times—on the bed, in the bathroom, and in the kitchen—with two of those instances being long enough to cause her to lose consciousness and have trouble breathing. See Hall, 561 S.W.3d at 456. The photographs and medical records

13

showed that Victim presented with a swollen face, bruising on her neck and chin, a lip abrasion or laceration, and dots that could have been petechiae on her face. Nurse Howard testified that petechiae indicate ruptured blood vessels and that when petechiae appear on the face, they also exist on the brain, and are visible postmortem as spots of brain bleeding.

In summary, the evidence of Victim's physical injuries, viewed in the light most favorable to the jury's verdict, consisted of loss of consciousness; visible bruising and abrasions on her neck; and soreness, pain, and bruising in other areas of her body, including the chest, knees, and lower back. See Lee, 528 S.W.3d at 67 (internal quotation omitted) (noting we view the evidence and all reasonable inferences in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict). Consistent with Missouri case law, the jury heard evidence from an expert witness connecting Victim's reported and observed injuries with a substantial risk of death sufficient to find serious physical injury. See Hall, 561 S.W.3d at 453; Crudup, 415 S.W.3d at 174. The expert witness noted the most severe risk from strangulation is obviously death, and equally "[o]bviously . . . the survival of the victim demonstrates that the ultimate event was avoided," such that the substantial *risk* of death is all that is required to prove serious physical injury. See Johnson, 770 S.W.2d at 265. In this case, Victim's survival does not negate the life-threatening consequences she faced from being repeatedly strangled unconscious. See id.; see also Hall, 561 S.W.3d at 453 (quoting Kruger, 926 S.W.2d at 488). Viewed in the light most favorable to the verdict, the evidence indicated that Madrigal twice strangled Victim to a state of unconsciousness. Combined with the expert witness testimony on the range of severe medical consequences therefrom, the record plainly evidences "circumstances which give rise to apprehension of life[-]threatening consequences" and "a legitimate concern that [Victim] could die or suffer more than a momentary loss of bodily

14

function." Hall, 561 S.W.3d at 453 (internal citations omitted). We are persuaded that the record contains sufficient evidence from which the jury reasonably could find serious physical injury. See id.; see also Section 556.061(44); Carpenter, 592 S.W.3d at 805 (quoting Hughes, 469 S.W.3d at 900). The trial court did not err in denying Madrigal's motion for acquittal and motion for new trial on his conviction for the class A felony of first-degree domestic assault. See Stewart, 560 S.W.3d at 533 (quoting Wright, 382 S.W.3d at 903); Lee, 528 S.W.3d at 67 (quoting Bateman, 318 S.W.3d at 686–87).

Because we find the evidence was sufficient to find serious physical injury under the category for substantial risk of death, we need not analyze the remaining categories of protracted impairment or disfigurement. See Carpenter, 592 S.W.3d at 805 (quoting Hughes, 469 S.W.3d at 900). Point One is denied.

## II.    Point Two—The Trial Court Committed No Error, Plain or Otherwise, When Instructing the Jury on Serious Physical Injury

In his second point on appeal, Madrigal claims the trial court plainly erred in instructing the jury on first-degree domestic assault without defining "serious physical injury" in the instruction.

### A.    Standard of Review

Madrigal did not preserve his claim of instructional error by objecting to the instruction nor alleging the error in his motion for new trial. See Rule 28.03[3] (requiring specific objections to instructions and verdict forms be made at trial and renewed in a motion for new trial); Rule 29.11 (requiring allegations of error in jury-tried cases be included in a motion for new trial in order to be preserved for appellate review). He requests we grant discretionary plain-error review under Rule 30.20. "Plain error review under Rule 30.20 is used sparingly and is limited

---

[3] All Rule references are to Mo. R. Crim. P. (2022).

to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice." State v. Spry, 252 S.W.3d 261, 266 (Mo. App. S.D. 2008) (internal citation omitted).

A trial court's failure to comply with the MAI-CR and its corresponding Notes on Use raises a presumption of prejudicial error. King v. State, 638 S.W.3d 113, 119 (Mo. App. W.D. 2022) (citing Rule 28.02); see also State v. Arnold, 397 S.W.3d 521, 528 (Mo. App. S.D. 2013) (citing Spry, 252 S.W.3d at 266) (noting that omission of an instructional definition required by MAI-CR is presumed to be prejudicial error). Correspondingly, "[t]he Missouri Supreme Court's Order enacting MAI-CR 4th specifically provided that '[t]he instructions, forms, and Notes on Use for MAI-CR4th . . . must be used and followed . . . and *any such use shall not be presumed to be error.'"* Bullard v. State, 627 S.W.3d 458, 466 n.4 (Mo. App. E.D. 2021) (internal quotation omitted) (second and third alterations in original) (emphasis added).

B.      Analysis

The parties agree that Instruction 5, the verdict director for first-degree domestic assault, was derived from MAI-CR 419.73. MAI-CR 419.73 expressly provides in its Notes on Use No. 8 as follows:

> When the following term is used in this instruction, the paragraph defining that term must be used: "serious physical injury." *If this term is used in more than one instruction, the paragraph defining that term need not be included in this instruction. In that case, such terms must be defined in a separate instruction.*

(Emphasis added).

The trial court correctly instructed the jury regarding "serious physical injury" and properly adhered to the MAI-CR Notes on Use. See id.; Bullard, 627 S.W.3d at 466 n.4. The record clearly shows that the term "serious physical injury" was used in more than one instruction. Specifically, "serious physical injury" appeared in Instruction 5 for first-degree domestic assault and also in the verdict director for the lesser-included offense of fourth-degree

16

domestic assault. Rather than defining "serious physical injury" in Instruction 5, the definition of "serious physical injury" was given to the jury in a separate instruction, Instruction 21. The Notes on Use for MAI-CR 419.73 explicitly call for defining "serious physical injury" in a separate instruction when the term appears in more than one instruction. Accordingly, Madrigal's argument that the trial court erred by not defining "serious physical injury" in Instruction No. 5 is without merit. See Bullard, 627 S.W.3d at 466 n.4; see also King, 638 S.W.3d at 121 (finding the defendant was not prejudiced by trial counsel's failure to object to the jury instruction for attempted first-degree assault that defined the terms "serious physical injury" and "assault" in separate instructions, even where the relevant terms were not used in more than one instruction, because the Notes on Use permit the definitional instructions to be set forth in separate instructions). In making his argument for plain error, Madrigal neglects the plain language of the applicable MAI-CR Notes on Use and overlooks the fact that the trial court gave a separate instruction defining "serious physical injury," resulting in a meritless claim that identifies no error, plain or otherwise. See Spry, 252 S.W.3d at 266 (internal quotation omitted). Point Two is denied.

**III.    Points Three and Four—No Prejudicial Error in Evidentiary Rulings**

In Points Three and Four, Madrigal argues the trial court erred in admitting evidence of the Voicemail and Seatbelt Incident, respectively, because each piece of prior bad act evidence was more prejudicial than probative in establishing Madrigal had the propensity to commit the charged offenses.

A.    Standard of Review

A trial court has broad discretion to admit or exclude evidence at trial. State v. Buechting, 633 S.W.3d 367, 376 (Mo. App. E.D. 2021) (citing State v. Shockley, 410 S.W.3d 179, 195 (Mo. banc 2013)) (additional citations omitted). We therefore review preserved claims

17

of error in evidentiary rulings for whether the trial court abused its discretion.[4]  Id.  "A trial court abuses its discretion when its decision is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration."  State v. Thomas, 628 S.W.3d 686, 691 (Mo. App. E.D. 2021) (quoting State v. McBenge, 507 S.W.3d 94, 112 (Mo. App. E.D. 2016)).

We review an appeal from an evidentiary ruling "for prejudice, not mere error, and the trial court's decision will be reversed only if the error was sufficiently prejudicial that it deprived the defendant of a fair trial."  Buechting, 633 S.W.3d at 376 (citing State v. McLaughlin, 265 S.W.3d 257, 262 (Mo. banc 2008)).  Where a criminal defendant alleges the evidence was improperly admitted, "the test for prejudice is whether the error was outcome-determinative."  Thomas, 628 S.W.3d at 691 (internal quotation omitted).

Further, we will affirm the trial court's ruling on the admissibility of the evidence if it is sustainable under any theory.  State v. Pascale, 386 S.W.3d 777, 780 (Mo. App. E.D. 2011) (citing State v. McLaughlin, 272 S.W.3d 506, 509 (Mo. App. E.D. 2008)).

B.      Analysis

"Generally, evidence of prior bad acts is inadmissible to show the propensity of the defendant to commit the crime for which he is charged."  State v. Winfrey, 337 S.W.3d 1, 11

---

[4] The State suggests Points Three and Four were not preserved because Madrigal argued at the trial court that the evidence was more prejudicial than probative and on appeal raises a different legal theory that the evidence was improper propensity evidence.  We disagree.  A thorough review of the record indicates Madrigal's underlying contentions responding to the State's proffered prior bad act evidence encompassed the specific claims on appeal.  In particular, at trial, Madrigal challenged that the evidence was inadmissible under State v. Conley, 873 S.W.2d 233 (Mo. banc 1994), which explains the general rule that prior bad acts cannot be admitted for the purpose of showing the accused's propensity to commit the charged offense.  Indeed, Madrigal argues that the reason the evidence was more prejudicial than probative was *because* it was prior bad act propensity evidence, as summarized in Conley.  The trial court overruled Madrigal's objections, overruled his renewed objections when each piece of evidence was introduced, and denied Madrigal's motion for new trial, in which he preserved his specific objections to both the Seatbelt Incident and the Voicemail.  Accordingly, we deny the State's request to find the points were not preserved for appellate review.  See State v. Amick, 462 S.W.3d 413, 415 (Mo. banc 2015); State v. Jackson, 636 S.W.3d 908, 919 (Mo. App. W.D. 2021).

18

(Mo. banc 2011) (citing State v. Fassero, 256 S.W.3d 109, 118 (Mo. banc 2008)); State v. Miller, 372 S.W.3d 455, 473 (Mo. banc 2012) (internal quotation omitted); Conley, 873 S.W.2d at 236 (internal citation omitted). This prohibition is rooted in the principle "that an accused may not be found guilty or punished for a crime other than the one on trial." Conley, 873 S.W.2d at 236. We exclude prior bad act evidence "to prevent the jury from 'us[ing] the evidence of the uncharged crime to infer the defendant has a general criminal disposition, a bad character, or propensity or proclivity to commit the type of crime charged,' and in turn, 'basing a finding of guilt on the uncharged crime.'" Jackson, 636 S.W.3d at 920–21 (quoting Thomas, 628 S.W.3d at 691).

However, Missouri recognizes that evidence of prior bad acts is admissible for other purposes, namely to "to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the alleged perpetrator." Winfrey, 337 S.W.3d at 11 (internal quotation omitted). Particularly relevant to this appeal, "[t]here is significant precedent in Missouri allowing evidence of prior misconduct by the defendant directed to the victim to be admitted in cases of assault." State v. White, 549 S.W.3d 51, 55 (Mo. App. E.D. 2018) (internal citation omitted). "The offered evidence must be both logically relevant, in that it has some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial, and also legally relevant, in that its probative value outweighs its prejudicial effect." Winfrey, 337 S.W.3d at 11 (internal citation omitted). "This balancing of prejudicial effect and probative value lies within the sound discretion of the trial court." Miller, 372 S.W.3d at 474 (internal quotation omitted).

### 1. Admission of the Voicemail

"One exception to the general rule regarding admissibility of prior bad acts is the curative admissibility doctrine, otherwise known as 'opening the door.'" State v. Salmon, 563 S.W.3d

725, 733 (Mo. App. E.D. 2018).  "While evidence of a criminal defendant's prior bad acts is generally inadmissible, a defendant is not in a position to complain of the State inquiring about matters brought into the case by his own question."  State v. Stanley, 609 S.W.3d 903, 916 (Mo. App. W.D. 2020) (quoting Fassero, 256 S.W.3d at 118).  "In other words, a defendant may not provoke a reply to his own argument and then claim error."  Id. (quoting Fassero, 256 S.W.3d at 118).

Here, the trial court deferred its ruling on whether the Voicemail was admissible prior bad act evidence until after Madrigal cross-examined Victim.  During cross-examination, Madrigal asked Victim several times about her answering Madrigal's calls from jail despite having the option not to take his calls.  Through this line of questioning, Madrigal suggested Victim was not being truthful when she testified that she wanted Madrigal to stop calling her as well as implied that the relationship between Madrigal and Victim had resumed.  Subsequently, the trial court permitted the State to introduce the Voicemail into evidence, finding that because Madrigal cross-examined Victim as to why she answered his phone calls, the State could respond by adducing evidence that would allow the jury to consider the context of the calls.  On redirect examination, the State asked Victim about why she answered Madrigal's phone calls and introduced the Voicemail into evidence.  In the Voicemail, recorded one month prior to the April 5 incident, Madrigal cursed at Victim and threatened that if she did not answer his calls he would contact DFS about her children, go to her place of employment, and generally ruin her life.

A trial court does not err by permitting the State to introduce prior bad act evidence on redirect examination when the defendant has opened the door to the evidence on cross-examination.  Stanley, 609 S.W.3d at 916 (citing Fassero, 256 S.W.3d at 118); Pascale, 386 S.W.3d at 780.  "On redirect examination, a witness may testify to any matter that tends to

20

refute, weaken or remove unfavorable inferences in the testimony of cross-examination."

Pascale, 386 S.W.3d at 780 (quoting State v. Gardner, 8 S.W.3d 66, 72 (Mo. banc 1999)).

Pascale considered several instances of prior bad act testimony challenged by the defendant, who was found guilty of domestic abuse against his wife. Pascale, 386 S.W.3d at 779. Regarding one of those instances, this Court determined the trial court did not err in admitting evidence of uncharged prior abuse of the stepdaughter because the defendant opened the door to the State's line of questioning during cross-examination. Id. at 780. Specifically, the defendant asked the wife questions implying that the stepdaughter was biased against the defendant because he had told her to stay away from her neighbor, and the State sought to dispel that implication by asking the wife on redirect examination whether she had ever seen the defendant abuse his stepdaughter. Id. This Court held the trial court did not abuse its discretion in overruling the defendant's objection to the prior bad act evidence because the State was permitted to rebut the inference of bias. Id.

Here, similar to Pascale, Madrigal opened the door to rebuttal evidence as to why Victim continued to answer Madrigal's phone calls. See id. The State was permitted to refute the implication that Victim kept taking Madrigal's calls because she wanted to do so or had resumed their relationship by providing an alternative explanation for why Victim continued to accept Madrigal's calls—namely, that Madrigal threatened to have her children taken away from her, show up at her workplace, and disrupt her life. Although Madrigal suggests the Voicemail lacked relevance to his intent to commit the charged offense because he did not threaten to physically harm her in the message, the Voicemail was admissible because Madrigal opened the door to the evidence, and its probative value outweighed any prejudicial effect. See id.; see also Winfrey, 337 S.W.3d at 11 (internal citation omitted). The State was permitted to question

Victim about the Voicemail to rebut unfavorable inferences brought out by cross-examination in that the evidence suggested Victim took Madrigal's calls because he had made threats to ruin her life by trying to have her children taken away if she did not answer him. See Pascale, 386 S.W.3d at 780.

Accordingly, the trial court did not abuse its discretion in admitting the Voicemail following Madrigal's cross-examination of Victim. See Thomas, 628 S.W.3d at 691 (citing McBenge, 507 S.W.3d at 112). Point Three is denied.

### 2. Admission of the Seatbelt Incident

Madrigal next argues the trial court abused its discretion in admitting prejudicial propensity evidence that the day before the April 5 incident, Madrigal strangled Victim with a seatbelt. The State maintains the Seatbelt Incident was relevant to intent, motive, absence of mistake, and painting a complete and coherent picture of the events because Madrigal demonstrated the same type of behavior as the charged offense and showed his intent to cause Victim serious injury.

"It is well settled in the law that, in cases of murder or assault, prior assaults or abuse by the defendant of the victim are admissible as being logically relevant to show motive, intent, or absence of mistake or accident." Lee, 528 S.W.3d at 65 (internal quotation omitted). "Such evidence is only admissible for those purposes, however, if the defendant puts motive, intent, mistake or accident at issue in the case." Id. (internal quotation omitted). However, "[i]t is also well settled that evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged may be admissible 'to present a complete and coherent picture of the events that transpired.'" Id. at 66 (quoting Miller, 372 S.W.3d at 474; State v. Primm, 347 S.W.3d 66, 70 (Mo. banc 2011)). "Generally, acts, statements, occurrences, and the

22

circumstances forming part of the main transaction may be shown in evidence . . . where they precede the offense immediately or by a short interval of time and tend, as background information, to elucidate a main fact in issue." State v. Smith, 353 S.W.3d 100, 105 (Mo. App. W.D. 2011) (internal quotation omitted); see also Jackson, 636 S.W.3d at 921–22 (quoting Smith, 353 S.W.3d at 105). "In cases involving adult abuse, a defendant's history of violent or threatening conduct towards the same victim 'can be especially probative.'" State v. Whitaker, 405 S.W.3d 554, 559 (Mo. App. E.D. 2013) (internal quotation omitted); see also White, 549 S.W.3d at 55 (internal citation omitted).

In Miller, a case involving sexual abuse of a minor, the victim testified that she did not tell anyone what had happened when the defendant first started abusing her because she was too afraid, given that the defendant had been physically abusing her mom and brothers. Miller, 372 S.W.3d at 474. The Supreme Court of Missouri affirmed the trial court's admission of the prior uncharged abuse of the victim's mother and brothers because it tended to provide a complete and coherent picture of the events that transpired. Id. at 474. The Supreme Court reasoned that the testimony of the prior uncharged abuse was not more prejudicial than probative because it was limited to instances of the victim's personal knowledge, established why the victim had not told police or family about the abuse earlier, and gave the jury a better overall picture of the relationship between the victim and the defendant during the instances of the charged acts of abuse. Id. Likewise, in Lee, where the defendant was charged with first-degree domestic assault, the Southern District affirmed the trial court's admission of prior uncharged acts of abuse against the victim because the evidence provided a full and complete picture of the events. Lee, 528 S.W.3d at 66. Specifically, the "[d]efendant's prior uncharged physical abuse of [the]

23

[v]ictim was admissible to show the escalation of [the] [v]ictim's fear of [the] [d]efendant and explain why she did not immediately report the charged abuse[.]" Id.

Here, Madrigal argues he did not place intent or motive at issue, and therefore the trial court abused its discretion in admitting the Seatbelt Incident as relevant to intent. We disagree, and further recognize that we may affirm the trial court's admission of the evidence if it is sustainable on *any* theory. Pascale, 386 S.W.3d at 780 (citing McLaughlin, 272 S.W.3d at 509). We are persuaded the Seatbelt Incident was admissible and more probative than prejudicial in its relevance to Madrigal's intent to cause Victim serious physical injury and to present a complete and coherent picture of the relationship between Madrigal and Victim. See Lee, 528 S.W.3d at 66 (quoting Miller, 372 S.W.3d at 474; Primm, 347 S.W.3d at 70). The present case is analogizable to Lee, where the defendant argued motive and intent were not at issue but the severity of the victim's physical injuries for purposes of proving first-degree domestic assault was at issue. See id. Here, because Madrigal put the severity of Victim's injuries at issue during trial, the trial court did not err in finding that the Seatbelt Incident was admissible as relevant to Madrigal's intent to cause serious harm to Victim. See id.; State v. Williams, 784 S.W.2d 309, 312 (Mo. App. E.D. 1990) (finding evidence of the defendant's prior uncharged assault against the victim one week prior to the charged conduct was admissible to show the defendant's animus towards the victim and his intent to inflict injury on her).

Moreover, the Seatbelt Incident was admissible under the complete-picture theory. See Lee, 528 S.W.3d at 66 (quoting Miller, 372 S.W.3d at 474; Primm, 347 S.W.3d at 70). In cross-examining Victim about the severity of her injuries from the strangling, Madrigal suggested Victim's delay in seeking medical treatment—filing for a restraining order then waiting for Mother to arrive home and accompany her to the hospital—undermined her claim of severe

24

physical injury. The State's introduction on redirect examination of the Seatbelt Incident, which occurred the day before the charged acts of strangling, gave a full and complete picture of the instigating circumstances of the charged offenses. See id. Madrigal strangled Victim with the seatbelt and told Victim he would kill her if she no longer wanted to be in a relationship with him. The next day, Madrigal strangled Victim when she told him their relationship was over and asked him to move out of Mother's house. Madrigal's threatening and strangling Victim the day before the charged offenses supports the complete-picture theory because it gave the jury the context of the end of their relationship and the escalation of his reaction to the breakup, as well as providing a potential explanation for Victim waiting for Mother to accompany her to the hospital and establishing Victim's fear of substantial injury or death. See id.; see also Miller, 372 S.W.3d at 473–74; Whitaker, 405 S.W.3d at 559–60.

Because the trial court did not err in admitting the Seatbelt Incident, we find no abuse of the trial court's discretion. See Thomas, 628 S.W.3d at 691 (citing McBenge, 507 S.W.3d at 112). Point Four is denied.

Conclusion

The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, Judge

Lisa P. Page, P.J., concurs.
Thomas C. Clark II, J., concurs.